UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------- X
DEAN NICOSIA, on behalf of himself and   :
all others similarly situated,   :   Case No. 14-CV-4513-SLT-LB
   :
          Plaintiff,   :
   :
   - against -   :
   :
AMAZON.COM, INC.,   :
   :
          Defendant.   :
   :
------------------------------------------------------- X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT AMAZON.COM, INC.'S MOTION TO COMPEL ARBITRATION

Gregory T. Parks (*admitted pro hac vice*)
Jacqueline C. Gorbey (*admitted pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103-2921
(215) 963-5000

-and-

Regina Schaffer-Goldman
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
(212) 309-6000

*Attorneys for Defendant Amazon.com, Inc.*

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ........................................................................................................... 1

II.  STATEMENT OF FACTS ............................................................................................. 2

    A.  Background on Amazon ...................................................................................... 2

        1.  Amazon.com ........................................................................................... 2

        2.  Amazon Prime ........................................................................................ 3

        3.  The Amazon Mom Program ................................................................... 3

        4.  Amazon's Conditions of Use, Prime Ts & Cs, and Mom Ts & Cs ........ 4

    B.  Amazon.com Checkout Pages ............................................................................. 5

    C.  Nicosias' Online Purchasing Habits and History ................................................ 5

    D.  Amazon Accounts and Purchases ....................................................................... 6

        1.  Amazon Accounts in Plaintiff's Name .................................................. 6

        2.  The Nicosias' Prime Account ................................................................ 7

    E.  Plaintiff's Purchases of 1 Day Diet .................................................................. 11

III.  PROCEDURAL HISTORY .......................................................................................... 11

    A.  The Previous Proceedings and Appeal .............................................................. 11

    B.  The Second Circuit Remanded For Further Proceedings On The Arbitration Issue ........ 12

    C.  The Parties Completed Extensive Discovery On Plaintiff's Agreement To Arbitrate ...... 12

IV.  STANDARDS .............................................................................................................. 13

V.  ARGUMENT ............................................................................................................... 14

    A.  Plaintiff Agreed to and Is Bound By the Conditions of Use ............................ 14

        1.  Plaintiff Had Actual, Constructive, and/or Inquiry Notice of Amazon's Conditions of Use Because He Placed Numerous Orders on Amazon.com ....... 14

        2.  Plaintiff Is Bound By Purchases Made By Others Acting on His Behalf .......... 16

        3.  Plaintiff Agreed to the Conditions of Use by Continuing to Make Purchases on Amazon.com After This Litigation Was Filed ........................... 17

        4.  Plaintiff's Purchases of 1 Day Diet Were Made from the Nicosias' Prime Account, Which Is Bound by the Conditions of Use .......................... 18

    B.  Plaintiff's Claims Are Clearly Within the Scope of the Arbitration Clause ................... 22

    C.  Any Challenges to the Conditions of Use Must Be Decided By the Arbitrator ............. 23

VIII.  CONCLUSION ............................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*5381 Partners LLC v. Shareasale.com, Inc.*,
   No. 12-cv-4263, 2013 WL 5328324 (E.D.N.Y. Sept. 23, 2013) ....................... 19

*Ace Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*,
   307 F.3d 24 (2d Cir. 2002) ................................................................. 22

*Adsit Co., Inc. v. Gustin*,
   874 N.E.2d 1018 (Ind. Ct. App. 2007) .................................................. 17

*Am. Express Co. v. Italian Colors Rest.*,
   133 S. Ct. 2304 (2013) ...................................................................... 13

*Arciniaga v. Gen. Motors Corp.*,
   460 F.3d 231 (2d Cir. 2006) .............................................................. 13

*AT&T Mobility LLC v. Concepcion*,
   131 S. Ct. 1740 (2011) ...................................................................... 13

*Berkson v. Gogo LLC*,
   97 F. Supp. 3d 359 (E.D.N.Y. 2015) .............................................. 4, 5, 15

*Buckeye Check Cashing, Inc. v. Cardegna*,
   546 U.S. 440 (2006) .......................................................................... 25

*Burcham v. Expedia, Inc.*
   No. 07-cv-1963, 2009 WL 586513 (E.D. Mo. Mar. 6, 2009) ....................... 22

*Cordas v. Uber Techs., Inc.*,
   No. 16-cv-04065, 2017 WL 658847 (N.D. Cal. Jan. 5, 2017) .................. 19, 24

*Cupples v. Valic Fin. Advisors, Inc.*,
   No. 13-cv-4501, 2014 WL 4662272 (E.D.N.Y. Sept. 18, 2014) .................... 24

*Curry v. Volt Info. Scis., Inc.*,
   No. 07-cv-7158, 2008 WL 719214 (S.D.N.Y. Mar. 18, 2008) ...................... 25

*Damato v. Time Warner Cable, Inc.*,
   No. 13-cv-994, 2013 WL 3968765 (E.D.N.Y. July 31, 2013) ...................... 25

*Ekin v. Amazon Servs., LLC*,
   84 F. Supp. 3d 1172 (W.D. Wash. 2014) ...................................... 16, 18, 23

*Fagerstrom v. Amazon.com, Inc.*,
   141 F. Supp. 3d 1051 (S.D. Cal. 2015) .................................................. 16

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Fteja v. Facebook, Inc.*,
　841 F. Supp. 2d 829 (S.D.N.Y. 2012) ............................................... 19

*Hofer v. Gap, Inc.*,
　516 F. Supp. 2d 161 (D. Mass. 2007)............................................... 16, 17

*In re Online Travel Co.*,
　953 F. Supp. 2d 713 (N.D. Tex. 2013) ............................................... 20

*Kamakazi Music Corp. v. Robbins Music Corp.*,
　684 F.2d 228 (2d Cir. 1982) ............................................................ 23

*KPMG LLP v. Cocchi*,
　132 S. Ct. 23 (2011) ....................................................................... 13

*Laumann v. Nat'l Hockey League*,
　989 F. Supp. 2d 329 (S.D.N.Y. 2013) ............................................... 24

*Mann v. N.A.S.A. Int'l, Inc.*,
　99-cv-11936, 2000 WL 1182823 (S.D.N.Y. Aug. 21, 2000) ................. 23

*Moore v. T-Mobile USA, Inc.*,
　No. 10-cv-527, Dkt. No. 112 (E.D.N.Y. Sept. 28, 2012) (Townes, J.), *recons. den.*,
　2013 WL 55799 (Jan. 2, 2013), *aff'd*, 548 F. App'x 686 (2013) ........... 23

*Motise v. Am. Online, Inc.*,
　346 F. Supp. 2d 563 (S.D.N.Y. 2004) ............................................... 22

*Motise v. Am. Online, Inc.*,
　No. 04-cv-1494, 2005 WL 1667658 (E.D. Va. June 24, 2005)............... 22

*Peng v. Uber Techs., Inc.*,
　No. 16-cv-545, 2017 WL 722007 (E.D.N.Y. Feb. 23, 2017)............. 13, 18, 24

*Peters v. Amazon Servs., LLC*,
　--- F. App'x ----, 2016 WL 5940052 (9th Cir. Oct. 13, 2016)............... 18

*Peters v. Amazon Servs., LLC*,
　2 F. Supp. 3d 1165, 1173 (W.D. Wash. 2013), *aff'd*, -- F. App'x --, 2016 WL
　5940052 (9th Cir. Oct. 13, 2016) ..................................................... 23

*Ranazzi v. Amazon.com, Inc.*,
　46 N.E.3d 213 (Ohio Ct. App. 2015) ................................................. 16

*Revitalization Partners, LLC v. Equinix, Inc.*,
　No. 16-cv-1367, 2017 WL 823291 (W.D. Wash. Mar. 2, 2017)............... 16, 17

*Salameno v. Gogo Inc.*,
　No. 16-cv-0487, 2016 WL 4005783 (E.D.N.Y. July 25, 2016), *recons. denied*, 2016
　WL 4939445 (E.D.N.Y. Sept. 13, 2016) ........................................... 15, 21

## <u>TABLE OF AUTHORITIES</u>
**(continued)**

**Page(s)**

*Seldon v. Airbnb, Inc.*,
    No. 16-cv-933, 2016 6476934 (D.D.C. Nov. 1, 2016) ......................................................... 19

*Skagit State Bank v. Rasmussen*,
    745 P.2d 37 (Wash. 1987) ................................................................................................. 14

*Smith v. Zlibris Publishing*,
    No. 15-cv-5334, 2016 WL 5678566 (E.D.N.Y. Sept. 30, 2016) ........................................ 13

*Starke v. Gilt Groupe, Inc.*,
    No. 13-cv-5497, 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014) ......................................... 19

*Yakima Cnty. (West Valley) Fire Prot. Dist. No. 12 v. City of Yakima*,
    858 P.2d 245 (Wash. 1993) ............................................................................................... 14

**STATUTES**

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ............................................................................. 1

9 U.S.C. § 2 ................................................................................................................................ 13

**OTHER AUTHORITIES**

AAA Consumer Rules, *available at*: www.adr.org/consumer (last visited Mar. 8, 2017) ......................... 24

Defendant Amazon.com, Inc. ("Amazon") submits this Memorandum of Law in support of its Motion to Compel Arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA").

## I.   INTRODUCTION

On February 4, 2015, Judge Townes dismissed Plaintiff's claims on the grounds that he had agreed to the Amazon Conditions of Use, which mandate arbitration of any claims against Amazon. Plaintiff appealed.  On August 25, 2016, the Second Circuit vacated and remanded.  The Second Circuit emphasized that it "did *not* hold that there was no objective manifestation of mutual assent [to the arbitration agreement] here as a matter of law."  Instead the court concluded that, based on the limited record before it and applying the liberal motion to dismiss standard, "reasonable minds could disagree" on whether Plaintiff had constructive notice of the Amazon Conditions of Use.  The Second Circuit therefore remanded for further proceedings, noting that "factual questions remain as to the formation of the agreement to arbitrate."

After discovery, reasonable minds can no longer disagree.  On the current record, there can be no dispute that Plaintiff had constructive notice of and is bound by Amazon's Conditions of Use and the arbitration provision contained therein.  In particular, discovery established that:

- Plaintiff placed at least 51 orders on Amazon that he can recall using accounts in his name and an Amazon Prime account he shares with his wife.  In placing those orders, he repeatedly viewed the language on Amazon's order page stating that "By placing your order, you agree to Amazon.com's privacy notice and conditions of use."  In each instance, he then clicked on a button that says "Place your order."  Plaintiff acknowledges he was aware that the words referring to the Conditions of Use were on the screen.  Although he claims not to have read the Conditions of Use, his awareness of their existence is sufficient in itself to establish constructive notice and bind him to their terms.

- Plaintiff testified that other people, including his wife and some people involved in a business Plaintiff conducted, placed orders on Amazon with his consent and on his behalf.  Their agreement to the Amazon Conditions of Use is binding on Plaintiff.

- Plaintiff continued to place orders on Amazon.com after this litigation began, when there was no question that he was actually aware of the Conditions of Use and arbitration clause, and he therefore repeatedly agreed to arbitrate his claims in this case.

- Plaintiff placed the two orders of 1 Day Diet that give rise to his claims from an Amazon Prime Account that he shared and used jointly with his wife.  Plaintiff's wife managed the account with Plaintiff's consent.  As Plaintiff's agent, his wife expressly agreed to

1

various Amazon terms and conditions, including the Prime Terms & Conditions and the Conditions of Use through sign-ups for the Amazon Mom program and Amazon Prime. That account also made 573 purchases after August 19, 2011, when Amazon added an arbitration clause and class action waiver to its Conditions of Use.

Both Plaintiff and his wife are avid and frequent online shoppers and sophisticated Amazon customers. They took advantage of many of Amazon's programs, services, and products. In doing so, they repeatedly visited website pages displaying Amazon's Conditions of Use on a portion of the screen visible to them and clicked on a button to agree to the Conditions of Use. With the more fully developed factual record detailed below, and applying a standard akin to summary judgment, Plaintiff should be compelled to arbitrate under Amazon's Conditions of Use that he repeatedly agreed to honor.

## II.      STATEMENT OF FACTS

### A.      Background on Amazon

#### 1.      Amazon.com

Amazon.com is a leading online retail website and marketplace offering hundreds of millions of unique products, including its own products and products offered for sale by third parties. Rule 56.1 Statement of Undisputed Material Facts dated April 10, 2017 ("SUF"), ¶¶ 1-2. To purchase an item on Amazon.com, a customer must create or use an Amazon account. *Id.* ¶ 3. Unlike some other ecommerce sites, it is not possible to check out as a "guest" on Amazon.com. *Id.* ¶ 4. Use of an existing account requires submission of the account's username and password. *Id.* ¶ 5. A user can sign in by manually entering his or her username and password. *Id.* ¶ 6. In some instances, Amazon also allows a user to elect to keep an account signed in on a particular computer or other device. *Id.* ¶ 7.

In addition, some browser software allows users to "store" the username and password for a particular website, such that the computer itself would automatically enter or generate the username and password. *Id.* ¶ 9. Thus, if an account holder elects to "keep me signed in," or stores the password on his or her browser software, any individual who has access to that computer or other device would be able to make a purchase on that account. *Id.* For these reasons, at all relevant times, the Amazon Conditions of Use have advised customers that "If you use any Amazon Service, you are responsible for maintaining the

confidentiality of your account and password and for restricting access to your computer, and you agree to accept responsibility for all activities that occur under your account or password." *Id.* ¶ 10. The reason for that policy is obvious: Amazon can never know with certainty which specific person is sitting at a customer's computer using the customer's account.

### 2.    Amazon Prime

Amazon launched its popular Prime program in 2005. *Id.* ¶ 11. Initially, Prime offered free two-day shipping, discounted one-day shipping, and other invitee benefits for an annual fee. *Id.* ¶ 12. Over time, Prime has dramatically increased its offerings to include video and ad-free music streaming, books with Audible narration, video game access, and many other valuable benefits. *Id.* ¶ 14.

An Amazon customer may sign up for Prime through different "pipelines" or paths. *Id.* ¶ 15. Regardless of which path they use, all customers who sign up for Prime must accept the Amazon Prime Terms & Conditions (the "Prime Ts & Cs"). *Id.* ¶ 16. Any time a customer signs up for Prime on a computer web browser or a mobile device, he or she must click a button to begin a subscription, which contains language such as "Confirm," "Signup," or "Start your free trial." *Id.* ¶ 17. Karen Ressmeyer, in-house counsel at Amazon who has been with the company since 1998 and been the lead lawyer for the Prime program since 2009, made sure when customers signed up for Prime on a computer web browser, or a mobile device, a link to the Prime Ts & Cs was included in the sign-up language **directly above or below** the button customers must click to sign up. *Id.* ¶ 18; Declaration of Karen Ressmeyer dated April 6, 2017 (the "Ressmeyer Declaration"), ¶ 2. The Prime Ts & Cs and linked content describe Prime shipping benefits, membership fees, and other features and conditions of the Prime program. *Id.* ¶ 19. They further provide that all Prime customers agree to the Amazon Conditions of Use. *Id.* ¶¶ 28-29, 31.

### 3.    The Amazon Mom Program

Amazon launched the Amazon Mom program in September 2011. *Id.* ¶ 20. At the time, Amazon Mom was a free program that offered its members three months of free two-day shipping with Prime, 30% off baby diapers and wipes, and other exclusive deals. *Id.* ¶ 21. All customers who signed up for Amazon Mom were required to accept: (a) the Amazon Mom Terms & Conditions (the "Mom Ts & Cs"),

3

(b) the Prime Ts & Cs, and (c) the Amazon Conditions of Use.  *Id.* ¶¶ 28, 30-31.

#### 4.        Amazon's Conditions of Use, Prime Ts & Cs, and Mom Ts & Cs

Amazon's site is governed by its Conditions of Use, which have contained an arbitration agreement and class action waiver since August 19, 2011.  *Id.* ¶¶ 23-24.  When making purchases using the standard Amazon.com checkout page, customers must accept the Conditions of Use.  *Id.* ¶ 25.  For example, during the relevant time period from April 4, 2011 to June 26, 2013, at the top of Amazon's checkout page is the text "Review your order."  *Id.*  ¶ 26.  Beneath that text is the line "By placing your order, you agree to Amazon.com's privacy notice and conditions of use."  *Id.*  The relevant portion of the screen looks like this:



The blue underlined text elements are hyperlinks to the Privacy Notice and Conditions of Use in effect at the time the order was placed.  *Id.*  Ms. Ressmeyer explained that the area at the top of the page is "some of our most valuable real estate."  *Id.* ¶ 36.  We all naturally read from top to the bottom, left to right.  Here, starting at the top and working left to right, Plaintiff would have seen that by placing his order he agreed to the Conditions of Use and then had to click on the "Place your order" button to the right.  *Id.* ¶ 26.  Indeed, in the *Berkson* case Plaintiff has cited so much, Judge Weinstein found that text in exactly this area of the screen gets the most attention (and is presented in "red" indicating such areas in the opinion Judge Weinstein wrote).  *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 378-79 (E.D.N.Y. 2015).  In addition, there is a link to the Conditions of Use at the bottom of every page on Amazon.com.  SUF, ¶ 27.

The Conditions of Use are also incorporated by reference into the terms and conditions governing Amazon's various programs.  *Id.* ¶ 28.  For example, when a customer signs up for Amazon Prime, he or she acknowledges that he or she has read and agrees to the Prime Ts &Cs, which expressly incorporate the Conditions of Use.  *Id.* ¶ 29.  And when customers signed up for Amazon Mom, they were required to

agree to the Mom Ts & Cs, which expressly incorporated the Conditions of Use.  *Id.* ¶ 30.  They were also required to acknowledge that they had read and agreed to the Prime Ts & Cs in place at that time, which expressly incorporated the Conditions of Use.  *Id.* ¶ 31.

### B.    Amazon.com Checkout Pages

In the time period from April 4, 2011 to June 26, 2013, there was one basic format of Amazon.com's checkout page for customers using desktop browsers (which also applies to laptop computers or iPad browsers).  *Id.* ¶ 32.  From June 26, 2013 to October 7, 2013, Amazon tested two new checkout pages.  *Id.* ¶ 33.  During that period, a customer could have seen one of three layouts for Amazon's checkout pages.  *Id.*  Starting on October 7, 2013 until approximately the end of 2014, there was one primary layout for the Amazon.com checkout page.  *Id.* ¶ 34.  Importantly, across that entire time period, there was **always** language at the top of the page stating "Review your order" and beneath that "By placing your order, you agree to Amazon.com's privacy notice and conditions of use."  *Id.* ¶ 35.  Although the shipping options and details of the product could change, the top portion of the screen was **always** the same.  *Id.*  Plaintiff and his wife admitted they had no evidence to the contrary, and these facts are undisputed.  *Id.*

### C.    Nicosias' Online Purchasing Habits and History

Plaintiff is a former New York resident, now retired to North Carolina.  *Id.* ¶¶ 37-38, 42-45.  He is part owner of a building in New York, where there is a restaurant.  *Id.* ¶ 39.  Plaintiff is married to Annemarie Nicosia.  *Id.* ¶ 40.

Plaintiff and his wife shop on a number of online sites in addition to Amazon.com.  *Id.* ¶ 46.  At his deposition, Plaintiff testified that from approximately 2008 to 2016, he and his family increasingly purchased more and more items online.  *Id.* ¶ 47.  Because of "convenience, selection, and better prices," Plaintiff says he and his wife have come to purchase "endless things" online.  *Id.* ¶ 48.  He also testified that the frequency of his online shopping has increased since he moved to North Carolina.  *Id.* ¶ 49.  He and Ms. Nicosia buy diapers, clothes, toys, home products, electronics, sporting equipment, personal care items, housewares, bedding and furniture online.  *Id.* ¶ 50.  In addition to shopping on Amazon, Plaintiff

shops on a number of other websites like Wal-Mart.com and eBay, and books flights and hotels online. *Id.* ¶ 51.  Plaintiff's wife testified that, aside from Amazon, she has shopped on a number of other websites, including eBay, Wal-Mart, Nordstrom, Apple, and Macy's.  *Id.* ¶ 52.  She also has social media accounts on Facebook and Twitter.  *Id.* ¶ 53.  Over the years, Plaintiff and his wife have used many different devices to shop online, including at least two desktop computers, two laptops, five iPads, and their phones.  *Id.* ¶ 54.  Plaintiff is the sole income-earner in his household, and he and his wife share finances.  *Id.* ¶ 55.  Plaintiff pays the credit card bills for the credit cards used to make online purchases. *Id.* ¶ 56.  He relies on his wife to manage the Amazon Prime account that they both use.  *Id.* ¶ 57.

Plaintiff testified that, in his experiences online, he has encountered terms and conditions that he has had to scroll through and then click a button to proceed, but has *never* paused to read those terms and conditions.  *Id.* ¶ 58.  He also testified that he is familiar with website hyperlinks that are underlined and/or a contrasting color.  *Id.* ¶ 59.  In other words, Plaintiff acknowledges remaining willfully blind to the terms that users routinely and necessarily accept in order to shop and operate online.

### D.    Amazon Accounts and Purchases

#### 1.    Amazon Accounts in Plaintiff's Name

Amazon's records reflect that Plaintiff created three different accounts on Amazon.com.  *Id.* ¶ 60. Although Plaintiff initially testified that he does not recall creating an account on Amazon, he later admitted that it was possible that he had done so.  *Id.* ¶ 61.[1]  There are a total of 35 orders on the three accounts in Plaintiff's name, nine of which were made after August 19, 2011, when the Conditions of Use had an arbitration clause and class action waiver.  *Id.* ¶ 64.

Pursuant to this Court's Order dated January 27, 2017, Dkt. No. 96, Plaintiff identified 51 purchases he believed he recalled making, including through accounts in his own name.  *Id.*  ¶ 65.  But at his deposition, Plaintiff admitted that this list represented items he believed he had ordered and that it was

---

[1] In response to Amazon's arbitration-related discovery requests, Plaintiff initially asserted that he did not have any accounts in his name on Amazon.com.  *Id.* ¶ 62.  Plaintiff subsequently amended those responses after Amazon produced documents evincing three different accounts in his name.  *Id.* ¶ 63.

possible he had placed other orders that he could not recall.  *Id.* ¶ 66.  Plaintiff testified that many of his

orders on Amazon.com were audio and video equipment, brackets, and television wall mounts for the

restaurant in the building in which he was part-owner.  *Id.* ¶ 67.  In addition, for a number of purchases

on his accounts, Plaintiff testified that he had authorized various people involved with the restaurant in

the building he co-owned to purchase items for the restaurant, such as televisions, wallmounts, and other

equipment.  *Id.* ¶ 68.

Plaintiff also testified that he is familiar with Amazon's order page and recognizes that it has

certain language on it, including the reference to the Conditions of Use.  *Id.* ¶ 69. Despite this

recognition, he testified that he would never have clicked on a link to the Conditions of Use, stating that

"I would never click on it unless it prevented me from purchasing the item." *Id.* ¶ 71.

### 2.       The Nicosias' Prime Account

Amazon's records also reflect that an account in the name of Annemarie Nicosia was created on

Amazon on June 9, 2008 (the "Nicosias' Account" or the "Nicosias' Prime Account").  *Id.* ¶ 72.  The

email linked to that account is <u>katsouthern@gmail.com</u>.[2]  *Id.* ¶ 73.  As of August 24, 2016, the Nicosias'

Prime Account had placed 627 orders on Amazon, 573 of which were placed after August 19, 2011, when

the Conditions of Use had an arbitration clause and class action waiver.  *Id.* ¶ 76.  Although the account

was in Ms. Nicosia's name, both Plaintiff and Ms. Nicosia used that account to place orders on

Amazon.com, and it was fine with Ms. Nicosia that Plaintiff used her account.  *Id.* ¶ 77.  Ms. Nicosia

managed the Nicosias' Prime Account.  *Id.* ¶ 78.  Credit cards belonging to both Dean Nicosia and Ms.

Nicosia, as well as others, are linked to that account.  *Id.* ¶ 79.  Plaintiff paid the Prime membership fees

for the account.  *Id.* ¶ 80.

---

[2] Ms. Nicosia testified that she never checks that Gmail account.  *Id.* ¶ 74.  Plaintiff did not access or
review any emails on that account until sometime in 2016, when, for the first time, he sought to preserve
emails that were potentially relevant to this litigation that he started in 2014.  *Id.* ¶ 75.

### a.      Amazon Mom Sign-Up

According to Amazon's records, on September 30, 2011, the Nicosias' Account signed up for the Amazon Mom program and a free Prime trial.  *Id.* ¶ 81.  Ms. Nicosia testified that a family friend, Alfred Dennis, signed the account up for the Amazon Mom program at her request and with her permission.  *Id.* ¶ 82.  In order to sign up for the Amazon Mom program, including the free Prime trial, Mr. Dennis would have had to follow the sign-up flow for Amazon Mom that was in place on September 30, 2011.  *Id.* ¶ 83.

Specifically, at Step 1 of the sign-up process, Mr. Dennis would have clicked a "Continue" button directly underneath text stating that "By clicking the **Continue** button you acknowledge that you agree to the Amazon Mom Terms and Conditions."  *Id.* ¶ 84.  It appeared like this:



*Id.*  The orange underlined text is a hyperlink to the then-current version of the Mom Ts & Cs.  *Id.*  The Amazon Mom Ts &Cs in effect on September 30, 2011 stated: "Please note that your use of the Amazon.com website and the Amazon Mom membership are also governed by our Conditions of Use, Privacy Notice, Amazon Prime Terms and Conditions, as well as all other applicable terms, conditions, limitations and requirements on the Amazon.com Web site."  *Id.* ¶ 85.

Next, at Step 2 of the sign-up process, Mr. Dennis would have clicked a button stating "Sign up for Amazon Mom." *Id.* ¶ 86.  Beneath that button was language substantially similar to the following:

> By signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions and **authorize us to charge your credit card or another available credit card on file. Amazon Prime membership continues until cancelled.  If you do not wish to continue for $79/year, select 'Do not renew' from Your Account before your annual renewal date."** *Id.*

It looked like this:



By signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions and **authorize us to charge your card or another available card on file. Amazon Prime membership continues until cancelled. If you do not wish to continue for $79/year, select 'Do not renew' from Your Account before your annual renewal date.**

*Id.*  The blue underlined text is a hyperlink to the then-current version of the Amazon Prime Ts & Cs.  *Id.*

The Prime Ts & Cs in effect on September 30, 2011 stated the following:

> Please note that your use of the Amazon.com website and Prime membership are also governed by our Conditions of Use and Privacy Notice, as well as all other applicable terms, conditions, limitations and requirements on the Amazon.com Web site, all of which (as changed over time) are incorporated into these Terms. If you sign up for a Prime membership, you accept these terms, conditions, limitations and requirements.

*Id.* ¶ 87.  The blue underlined text elements are hyperlinks to the then-current Privacy Notice and Conditions of Use.  *Id.*

The Conditions of Use that were in effect at all times after August 19, 2011 contained an arbitration provision and a class action waiver, presented in bold text:

> **DISPUTES**
>
> **Any dispute or claim relating in any way to your visit to Amazon.com or to products or services sold or distributed by Amazon or through Amazon.com will be resolved by binding arbitration, rather than in court . . . .**
>
> . . . .
>
> **We each agree that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action.** If for any reason a claim proceeds in court rather than in arbitration **we each waive any right to a jury trial.** . . .

*Id.* ¶¶ 24, 88; *see also id.* ¶¶ 98, 124.

According to Amazon's records, the Nicosias' Account received extensions on its free Prime trial until October 11, 2012.  *Id.* ¶ 89.  The Nicosias' Account's free Prime trial ended on that date.  *Id.*  In order to continue to get Prime benefits, the Nicosias had to sign up for Prime again.

### b.     October 2012 Sign-Up for Amazon Prime

According to Amazon's records, on October 11, 2012, the Nicosias' Account again signed up for

Amazon Prime.  *Id.* ¶ 90.  Ms. Nicosia confirmed that she did so by clicking on a button allowing her to renew her Prime subscription.  *Id.* ¶ 91.  Because her credit card information was already in Amazon's system, she did not have to re-enter that information in signing up again.  *Id.* ¶ 92.  She could not recall whether there was language next to the button she clicked.  *Id.* ¶ 93.

Although Amazon does not have a depiction of the exact sign-up page Ms. Nicosia would have encountered on October 11, 2012, she would have been required to click a button that stated "Signup now" or "Confirm" (or similar language indicating that the user was about to start a Prime membership). *Id.* ¶ 94.  Beneath that button was language substantially similar to the following:

> By signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions and authorize us to charge your credit card (credit card name and last four digits) or another credit card on file. **Your Amazon Prime membership continues until cancelled.  If you do not wish to continue for $79/year plus applicable taxes, you may cancel anytime by visiting Your Account on Amazon.com.**

*Id.* ¶ 95.  There is no evidence to rebut the conclusion that Ms. Nicosia encountered a similar sign-up page.  Neither Plaintiff nor Ms. Nicosia could say otherwise.  *Id.* ¶ 96.  The Prime Ts & Cs that were in effect on October 11, 2012 stated:

> Please note that your use of the Amazon.com website and Prime membership are also governed by our Conditions of Use and Privacy Notice, as well as all other applicable terms, conditions, limitations, and requirements on the Amazon.com website, all of which (as changed over time) are incorporated into these Terms. If you sign up for a Prime membership, you accept these terms, conditions, limitations and requirements.

*Id.* ¶ 97.

After signing up for Prime, the email address associated with the Nicosias' Prime Account, katsouthern@gmail.com, would have received a "Welcome" email that contained information about the account's Amazon Prime subscription and yet another link to the Amazon Prime Ts & Cs.  *Id.* ¶ 99.

### c.    Use of and Orders on Nicosias' Prime Account

Plaintiff became aware that Ms. Nicosia had signed up for Prime benefits sometime in 2012, and he began availing himself of the free two-day shipping benefits.  *Id.* ¶ 101.  He was also aware that Ms. Nicosia took advantage of Prime's free two-day shipping benefits.  *Id.* ¶ 102.  Ms. Nicosia also testified that she availed herself of various Prime benefits like free two-day shipping and discounts on products

like diapers and wipes.  *Id.* ¶ 103.

At his deposition, Plaintiff testified that he had placed many orders using the Nicosias' Prime Account.  *Id.* ¶ 112.  He has also identified 38 purchases from November 2012 to late August 2016 that he can recall making on that account. *Id.* ¶ 113.  In particular, Plaintiff made the two purchases of 1 Day Diet at issue in this case from the Nicosias' Prime Account.  *Id.* ¶ 114.  He also identified 31 purchases he made after this litigation was filed.  *Id.* ¶ 115.

E.       **Plaintiff's Purchases of 1 Day Diet**

The two purchases of 1 Day Diet alleged in Plaintiff's Class Action Complaint (the "Complaint") were made using the Nicosias' Prime Account on January 30, 2013 and April 19, 2013.  *Id.* ¶ 120.  Those purchases were from a third party seller.  *Id.* ¶ 132.  In placing those orders, Plaintiff would have seen a screen substantially in the form of the order page in Exhibit E to the Ressmeyer Declaration.  *Id.* ¶ 121. At the top of that screen is the text "Review your order."  Beneath that text is the following language: "By placing your order, you agree to Amazon.com's privacy notice and conditions of use."  *Id.* ¶ 122. The blue underlined text elements are hyperlinks to the Privacy Notice and Conditions of Use in effect at the time the order was placed.  *Id.*  Plaintiff then agreed to the Conditions of Use by clicking the "Place your order" button to the right of the language at the top of the order screen.  *Id.* ¶ 123.

III.    **PROCEDURAL HISTORY**

A.       **The Previous Proceedings and Appeal**

Plaintiff filed his Complaint on July 28, 2014 purporting to represent a putative class of individuals who bought weight loss supplements on Amazon.com.  (Dkt. No. 1, ¶ 1.)  Plaintiff asserts claims for unjust enrichment, violations of Washington's Consumer Protection Act, and breach of implied warranty under Washington law.  (Compl. ¶¶ 103-130, 141-158).

Amazon moved to dismiss Plaintiff's Complaint because Plaintiff's claims are governed by a mandatory arbitration clause and class action waiver.  (Dkt. Nos. 52-62).  On February 4, 2015, Judge Townes granted Amazon's motion to dismiss, concluding that Plaintiff failed to state a claim because he was on constructive notice of Amazon's Conditions of Use which contained a mandatory arbitration

clause. (Dkt. 79, at 16-17). The Court also held that questions as to the validity of the agreement as a whole had to be submitted to arbitration. (*Id.* at 16-17). In the same Order, the Court also denied Plaintiff's motion for a preliminary injunction because he lacked standing.

B.    **The Second Circuit Remanded For Further Proceedings On The Arbitration Issue.**

Plaintiff appealed to the Second Circuit. On August 25, 2016, the Second Circuit affirmed the denial of Plaintiff's request for preliminary injunction. (Second Circuit Op., at 38-39, Aug. 25, 2016, No. 15-423, Dkt. No. 102-1 (2d Cir.)) The Second Circuit remanded for further proceedings on the arbitration issue. At the outset, the Second Circuit agreed with Judge Townes that the "question of whether the parties have agreed to arbitrate, i.e., the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." (*Id.* at 11). In analyzing that question, the Second Circuit found that at the motion to dismiss stage of the case with limited facts before it, "reasonable minds could disagree" on whether Plaintiff had constructive notice of the arbitration clause at issue. *Id.* at 34.

The Second Circuit's decision was based on a limited record that showed only that Plaintiff had made two purchases from Amazon by completing what was before the Court as Amazon's standard order page. (*Id.* at 28-35). The Second Circuit concluded that it could not hold as a matter of law on a motion to dismiss that Plaintiff could not plausibly maintain that he did not have constructive notice of the Conditions of Use. (*Id.* at 34-35). It therefore remanded for further proceedings. (*Id.* at 35, 39). The Second Circuit's opinion explicitly did not disturb Judge Townes's holding that any suggestion that the agreement was invalid as a whole must be addressed by the arbitrator. (*Id.* at 35, n. 7).

C.    **The Parties Completed Extensive Discovery On Plaintiff's Agreement To Arbitrate.**

On remand from the Second Circuit, the parties engaged in extensive discovery on whether Plaintiff had constructive notice of the arbitration clause at issue – producing hundreds of pages of documents and taking three depositions. The period for arbitration-related discovery ended on February 15, 2017 with a two week extension to depose Plaintiff's wife. (*See* Jan. 20, 2017 Scheduling Order).

## IV.    STANDARDS

The Federal Arbitration Act provides that "an agreement in writing to submit to arbitration an existing controversy . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2.  Under the FAA, "courts must 'rigorously enforce' arbitration agreements according to their terms," regardless of whether the claim arises under federal or state law. *Am. Express Co. v. Italian Colors Rest.*,133 S. Ct. 2304, 2309 (2013); *see AT&T Mobility LLC v. Concepcion*,131 S. Ct. 1740, 1746-48 (2011).  This rule requires courts to enforce class action waivers in arbitration agreements. *Concepcion*, 131 S. Ct. at 1748.  The FAA reflects an "emphatic federal policy in favor of arbitral dispute resolution." *KPMG LLP v. Cocchi*, 132 S. Ct. 23, 25 (2011) (per curiam).  As the Supreme Court succinctly stated, it is "beyond dispute that the FAA was designed to promote arbitration." *Concepcion*, 131 S. Ct. at 1749.  The Second Circuit has recognized, "it is difficult to overstate the strong federal policy in favor of arbitration" which is "often and emphatically applied." *Arciniaga v. Gen. Motors Corp*., 460 F.3d 231, 234 (2d Cir. 2006).

A court may only consider threshold questions of arbitrability: (1) whether the parties entered into an agreement to arbitrate in the first instance; and (2) whether the dispute falls within the ambit of the arbitration agreement.  *See* Second Circuit Op., at 11; *Smith v. Zlibris Publishing*, No. 15-cv-5334, 2016 WL 5678566, at *3 (E.D.N.Y. Sept. 30, 2016).  As Judge Townes has held, all other challenges to the enforceability or validity of the contract at issue must go to the arbitrator.  (Dkt. No. 79, at 16-17).

"In deciding motions to compel [arbitration], courts apply a 'standard similar to that applicable for a motion for summary judgment.'"  Second Circuit Op., at 12 (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)).  A court must "'consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with ... affidavits.'"  *Id.* (alteration in original and internal quotation marks omitted) (quoting *Chambers v. Time Warner*, Inc., 282 F.3d 147, 155 (2d Cir. 2002)).  "'[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [a court] may rule on the basis of that legal issue and avoid the need for further court proceedings.'" *Peng v. Uber Techs., Inc.*, No. 16-cv-545, 2017 WL 722007, at *5 (E.D.N.Y. Feb. 23, 2017) (quoting *Wachovia*

13

*Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011)).

**V.     ARGUMENT**

   **A.     Plaintiff Agreed to and Is Bound By the Conditions of Use**

   Under Washington law, "contract formation requires an objective manifestation of mutual assent."  Second Circuit Op., at 18.  As the Second Circuit emphasized:

> Manifestation of assent to an online contract is not meaningfully different, and can be accomplished by words or silence, action or inaction, so long as the user intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents. As with paper contracts or shrinkwrap agreements, to be bound, an internet user need not actually read the terms and conditions or click on a hyperlink that makes them available as long as she has notice of their existence.

*Id.* at 20 (internal citations and quotations omitted, emphasis added).  A person has notice of a fact if he or she has actual knowledge or is on inquiry or constructive notice of that fact.  *Id.* at 21.  A person is on inquiry notice where he or she "has reason to know it exists from all the facts and circumstances known to the person at the time in question or has received notification of it from someone who took such steps as may be reasonably required to inform the other person in ordinary course."  *Id.*

   Washington courts have repeatedly emphasized that a party who chooses not to read a contract to which he voluntarily agreed may not successfully argue that mutual assent is lacking.  *Yakima Cnty. (West Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 858 P.2d 245, 255 (Wash. 1993); *Skagit State Bank v. Rasmussen*, 745 P.2d 37, 39 (Wash. 1987) ("[A] party to a contract which he has voluntarily signed will not be heard to declare that he did not read it, or was ignorant of its contents.").  Thus, by choosing to remain willfully blind to the terms of the various online services Plaintiff uses, including Amazon.com, Plaintiff was proceeding at his own peril.

        **1.     Plaintiff Had Actual, Constructive, and/or Inquiry Notice of Amazon's Conditions of Use Because He Placed Numerous Orders on Amazon.com**

   Plaintiff had actual, constructive, and/or inquiry notice of and agreed to Amazon's Conditions of Use and the arbitration clause therein by placing at least 51 orders on Amazon using the three Amazon accounts in his name and the Nicosias' Prime Account.  SUF, ¶¶ 64-65.  In placing those orders, Plaintiff repeatedly viewed an order page that stated at the top: "By placing your order, you agree to the

Conditions of Use and Privacy Policy" and clicked a button that stated "Place your order" many times. *Id.* ¶¶ 32-35, 121-24.  At his deposition, Plaintiff admitted that he was familiar with the order page and was aware that there was language at the top of it.  *Id.* ¶ 69.  Although he claimed not to have read the language, *id.* ¶ 70, being aware of the existence of the language is sufficient for constructive or inquiry notice, particularly for a website visitor who saw the same language repeatedly.

Judge Weinstein recently recognized exactly this principle in *Salameno v. Gogo Inc.*, No. 16-cv-0487, 2016 WL 4005783 (E.D.N.Y. July 25, 2016), *recons. denied*, 2016 WL 4939445 (E.D.N.Y. Sept. 13, 2016).  In *Salemeno*, Judge Weinstein granted the defendant's motion to compel arbitration because the plaintiffs were sophisticated and frequent users of Gogo's in-flight service who "had knowledge of and provided consent to Gogo's terms of use and the arbitration clause" when they repeatedly viewed websites pages with links to the terms of use.  *Id.* at *5-6.  Notably, Plaintiff cited and heavily relied upon Judge Weinstein's earlier decision in a related *Gogo* case, citing it four times in his appellate brief and saying that "the facts of this case are substantially similar."  Second Circuit Dkt. No. 36, at 24.  In that decision, Judge Weinstein held that where the named plaintiffs saw a screen once with a link to terms and conditions without an arbitration clause, Gogo could not thereafter impose an arbitration obligation.  *Berkson*, 97 F. Supp. 3d at 368-76, 403-05.  In contrast, in *Salameno*, on a record showing that the plaintiffs saw a screen with a link many times, and where that link actually lead to an arbitration clause, Judge Weinstein compelled arbitration.  *Salameno*, 2016 WL 4005783, at *5-6.  Here, Plaintiff undoubtedly saw the screen with the link many times, and compelling arbitration is the appropriate result.

Similarly, here, Plaintiff is a frequent and sophisticated online shopper who knows how websites work, including hyperlinks.  He has shopped on a number of websites that notify consumers that by purchasing on that site, they are agreeing to terms and conditions.  *See* SUF, ¶¶ 46, 51; Declaration of Gregory T. Parks dated April 10, 2017 ("Parks Decl."), ¶¶ 10-12, Exs. 9-11.  He has repeatedly shopped on Amazon.com, purchasing a wide range of items, including big-ticket electronics, power tools, and household items.  *See* SUF, ¶¶ 64-65, 67.  He has viewed Amazon's order page many, many times, which necessarily had on his screen the link to the Conditions of Use with the arbitration clause (which,

importantly, he does not deny).  Thus, a reasonably prudent user in Plaintiff's situation would be on inquiry notice of Amazon's Conditions of Use.  Indeed, the three courts that have looked at Amazon's order screen on a motion to compel arbitration have concluded that it provides constructive notice and binds a purchaser to the Amazon Conditions of Use.  *See Fagerstrom v. Amazon.com, Inc.*, 141 F. Supp. 3d 1051, 1069 (S.D. Cal. 2015); *Ekin v. Amazon Servs., LLC*, 84 F. Supp. 3d 1172, 1173, 1175 n.5 (W.D. Wash. 2014); *Ranazzi v. Amazon.com, Inc.*, 46 N.E.3d 213, 218 (Ohio Ct. App. 2015).

### 2.    Plaintiff Is Bound By Purchases Made By Others Acting on His Behalf

Plaintiff is also bound by the Conditions of Use to the extent that he authorized other individuals, who are his agents, to place orders on his account on his behalf.  Under Washington law, an agency relationship "arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Revitalization Partners, LLC v. Equinix, Inc.*, No. 16-cv-1367, 2017 WL 823291, at *4 (W.D. Wash. Mar. 2, 2017) (quoting *Wash. Imaging Servs., LLC v. Wash. State Dep't of Revenue*, 252 P.3d 885, 892 (Wash. 2011)).  An agent can bind his or her principal when the agent has either actual or apparent authority:

> Both actual and apparent authority depend upon objective manifestations made by the principal. Actual authority depends on the objective manifestations made by the principal to the agent. Apparent authority depends on the principal's objective manifestations of the agent's authority to the third party claiming apparent authority. Such manifestations must cause the third party to actually or subjectively believe that the agent has the authority to act for the principal, and that belief must be objectively reasonable.

*Id.* (internal citations and quotations omitted).  Courts have applied these principles to purchases made online, holding that individuals who authorize others to place purchases on their behalf are bound by the terms and conditions to which their agent agreed. *See Hofer v. Gap, Inc.*, 516 F. Supp. 2d 161, 175 (D. Mass. 2007) (holding that the plaintiff was bound by Expedia's terms and conditions because plaintiff's friend and traveling companion had booked plaintiff's travel arrangements on Expedia's site and had accepted the online terms and conditions; the court held that this was "necessarily an agency relationship: the person booking the tickets is acting as an agent on behalf of the other members of the traveling party.

16

Implicit in that agency relationship is the power to bind the principal as to matters within the scope of the relationship, including the acceptance of the terms of a disclaimer."); *Adsit Co., Inc. v. Gustin*, 874 N.E.2d 1018, 1023-24 (Ind. Ct. App. 2007) (holding that a defendant was bound by a forum selection clause in an online agreement where her mother-in-law placed the purchase at issue; the daughter-in-law had provided her credit card to her mother-in-law for the purchase and thereby gave her mother-in-law "actual authority to engage in the transaction on her behalf").

Here, Plaintiff has testified that he authorized the owners, managers, and others employees at the restaurant in his building in Long Beach to make purchases for the restaurant.  SUF, ¶¶ 39, 68.  By authorizing these individuals to make purchases, he also impliedly gave them actual authority to enter into agreements with Amazon on his behalf.  *See Hofer*, 516 F. Supp. at 175; *Adsit*, 874 N.E.2d at 1023-24. These individuals also had apparent authority to accept the Conditions of Use on Plaintiff's behalf, as it is objectively reasonable for Amazon to believe that they were acting on Plaintiff's behalf.  *See Revitalization Partners*, 2017 WL 823291, at *4.  Similarly, when Ms. Nicosia made purchases on Plaintiff's behalf for the household, she too bound Plaintiff to Amazon's Conditions of Use.  *See* SUF, ¶ 111.  Amazon held up its end of the bargain and satisfied those orders; Plaintiff cannot now repudiate his end of the same bargain.

### 3.   Plaintiff Agreed to the Conditions of Use by Continuing to Make Purchases on Amazon.com After This Litigation Was Filed

Plaintiff has also repeatedly agreed to the Conditions of Use after it was clear that he had actual knowledge of them.  Since Amazon sent its letter to Judge Townes requesting a pre-motion conference for its motion to dismiss on September 23, 2014, Plaintiff has placed at least 27 orders on Amazon.com. SUF, ¶ 65.  In that letter, Amazon clearly argued that Plaintiff had agreed to be bound by the Conditions of Use by placing his purchases on Amazon.com.  In continuing to place orders on Amazon.com, Plaintiff has clearly and repeatedly assented to the Conditions of Use.  The Second Circuit's Opinion makes it clear that "actual knowledge" of an arbitration clause is unquestionably sufficient to compel arbitration. Second Circuit Op., at 21.

17

The Conditions of Use contain broad language and apply to "[a]ny dispute or claim relating in any way to your use of any Amazon Service, or to any products or services sold or distributed by Amazon or through Amazon.com." *See, e.g.*, SUF, ¶ 124.  Courts, including those in this Circuit, repeatedly hold that where there is no express limitation to "future disputes" in an arbitration clause, that clause may be applied to preexisting claims. *See, e.g.*, *Peng*, 2017 WL 722007, at \*11.  In particular, federal courts have held that the "any dispute or claim" language in Amazon's Conditions of Use applies retroactively.  *See Ekin*, 84 F. Supp. 3d at 1178 ("As Defendant points out, Chief Judge Pechman of the Western District of Washington held one year ago that a similarly worded arbitration provision of Amazon was plainly not limited to prospective disputes.  This District's ruling is amply supported by Ninth Circuit precedent and the decisions of sister circuits holding specifically that when arbitration agreements contain broad "relating to any dispute" language, both future and past disputes are included in the scope of the arbitration agreement (internal citations and quotations omitted)); *see also Peters v. Amazon Servs., LLC*, --- F. App'x ----, 2016 WL 5940052, at \*1 (9th Cir. Oct. 13, 2016) (holding that the broad "any dispute or claim" language in Amazon's Business Solutions Agreement "is not limited to prospective disagreements").  By continuing to place orders on Amazon.com from December 2014 through late August 2016, Plaintiff has continued to agree to Amazon's Conditions of Use and the arbitration clause contained therein, and therefore must arbitrate the claims at issue in this lawsuit.  Again, Amazon honored its end of the bargain by fulfilling those orders, and Plaintiff must be bound by the deal he chose to strike.

### 4.   Plaintiff's Purchases of 1 Day Diet Were Made from the Nicosias' Prime Account, Which Is Bound by the Conditions of Use

Plaintiff's claims in this case are also subject to mandatory arbitration because Plaintiff made the purchases at issue here from the Nicosias' Prime Account, which is subject to the Prime Ts & Cs and the Mom Ts & Cs.  *See* SUF, ¶¶ 81-99, 120.  Plaintiff's wife affirmatively agreed to those terms and conditions by signing up for the Amazon Mom program on September 30, 2011 (through her agent, Mr. Dennis) and for Amazon Prime on October 11, 2012. *See id.* ¶¶ 81-99.  Both the Amazon Prime Terms & Conditions and Amazon Mom Terms & Conditions expressly incorporate Amazon's Conditions of Use

18

with an arbitration clause.  *See supra* Section II.E.2; SUF, ¶¶ 23-24, 28-31, 81-99.  Moreover, the Nicosias' Prime Account has made 627 purchases on Amazon.com, and has therefore repeatedly agreed to Amazon's Conditions of Use.  SUF, ¶ 76.

*First*, as set forth above, Ms. Nicosia expressly asked and authorized her agent, Mr. Dennis, to sign her up for Amazon Mom so that she could take advantage of good deals on diapers and free two-day shipping.  *See supra* Section II.E.2.a; SUF, ¶¶ 81-89.  By doing so, she gave Mr. Dennis the authority to accept the Prime Ts & Cs and the Mom Ts & Cs on her behalf.  *See supra* Section V.A.2.

The two-step process by which the Nicosias' Prime Account agreed to the Prime Ts & Cs and the Mom Ts & Cs is clearly an enforceable agreement because at each step, the user was notified that by clicking a button, the user agreed to certain terms and conditions.  Courts across the country, including in this Circuit, have routinely upheld similar kinds of agreements. *See, e.g.*, *Cordas v. Uber Techs., Inc.*, No. 16-cv-04065, 2017 WL 658847, at *4 (N.D. Cal. Jan. 5, 2017) (holding that Uber user affirmatively assented to and was bound by Uber's Terms & Conditions because he "click[ed] 'DONE' to complete his sign-up process on a page clearly displaying the notice: 'By creating an Uber account, you agree to the Terms & Conditions and Privacy Policy;'" and the terms and conditions were in a "clickable box," which was a hyperlink); *Seldon v. Airbnb, Inc.*, No. 16-cv-933, 2016 6476934, at *4-5 (D.D.C. Nov. 1, 2016) (holding that user consented to Airbnb's Terms of Service where the mobile sign-up screen contained the text "By Signing up, I agree to Airbnb's Terms of Service," beneath three different sign-up buttons); *Starke v. Gilt Groupe, Inc.*, No. 13-cv-5497, 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014) (holding that a user who provided an email address and clicked "Shop Now" above language that said "you agree to the Terms of Membership" assented to an arbitration provision contained in the hyperlinked terms); *5381 Partners LLC v. Shareasale.com, Inc.*, No. 12-cv-4263, 2013 WL 5328324, at *4-8 (E.D.N.Y. Sept. 23, 2013) (finding assent to terms hyperlinked above button activating membership); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835-41 (S.D.N.Y. 2012) (enforcing hybrid clickwrap-browsewrap agreement,

where plaintiff indicated assent to terms of use by clicking "sign up," but terms of use were hyperlinked).[3] Perhaps more significantly, in its August 25 Opinion, the Second Circuit also indicated that the "presentation of terms . . . directly adjacent" to an action button "indicate[s] a user should construe clicking as acceptance."  Second Circuit Op., at 31.

Here, the Nicosias' Account user was clearly notified at two steps of the Amazon Mom sign-up process that the account was agreeing to various terms and conditions, including the Conditions of Use, which contained an arbitration clause and class action waiver.  The first page showed:



And the second had this on the screen:



SUF, ¶¶ 84, 86.

The Mom Terms & Conditions then in effect stated: "Please note that your use of the Amazon.com website and the Amazon Mom membership are also governed by our Conditions of Use, Privacy Notice, Amazon Prime Terms and Conditions, as well as all other applicable terms, conditions, limitations and requirements on the Amazon.com Web site."  *Id.* ¶ 85.  The Prime Terms & Conditions then in effect stated:

> Please note that your use of the Amazon.com website and Prime membership are also governed by our Conditions of Use and Privacy Notice, as well as all other applicable terms, conditions,

---

[3] *See also In re Online Travel Co.*, 953 F. Supp. 2d 713, 718-19 (N.D. Tex. 2013) (finding assent to terms where webpage provided notice that continuing with order indicated agreement to those terms); *Swift v. Zynga Game Network*, Inc., 805 F. Supp. 2d 904, 911-12 (N.D. Cal. 2011) (finding agreement to terms listed above the sign-up button).

> limitations and requirements on the Amazon.com Web site, all of which (as changed over time) are incorporated into these Terms. If you sign up for a Prime membership, you accept these terms, conditions, limitations and requirements.

*Id.* ¶ 87.  The blue underlined text elements are hyperlinks to the then-current Privacy Notice and Conditions of Use.  *Id.*

The Nicosias' Prime Account therefore expressly assented to the Mom Ts & Cs, the Prime Ts & Cs, and the Conditions of Use through the Mom sign-up process.

*Second*, Ms. Nicosia also expressly agreed to the Prime Ts & Cs by signing up for Amazon Prime again on October 11, 2012:

- Ms. Nicosia would have clicked a button that stated "Signup now" or "Confirm" (or other language indicating that the user was about to start a Prime membership).  Beneath that button was language substantially similar to the following: "By signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions . . . ." SUF, ¶ 95.  The blue underlined text element is a hyperlink to the then-current version of the Prime Ts &Cs.  *Id.*

- The Prime Ts & Cs that were in effect on October 11, 2012 stated:  "Please note that your use of the Amazon.com website and Prime membership are also governed by our Conditions of Use and Privacy Notice, as well as all other applicable terms, conditions, limitations, and requirements on the Amazon.com website, all of which (as changed over time) are incorporated into these Terms.  If you sign up for a Prime membership, you accept these terms, conditions, limitations and requirements." *Id.* ¶ 97.  The blue underlined text elements are hyperlinks to the then-current version of the Conditions of Use and Privacy Notice.  *Id.*

Thus, by signing up for Amazon Mom and Amazon Prime on those two occasions, the Nicosias' Prime Account agreed to and is bound by the Conditions of Use.  *See* Ressmeyer Tr. 209:17-210:25.

*Third*, the Nicosias' Prime Account also agreed to the Conditions of Use, and the arbitration clause and class action waiver therein, by placing 573 orders after August 19, 2011.  SUF, ¶ 76.  Putting aside Plaintiff's purchases, Ms. Nicosia placed hundreds of orders on Amazon.com and therefore saw Amazon's checkout page hundreds of times.  She is a seasoned online consumer who has shopped on a number of websites that notify consumers that by purchasing on that site, they are agreeing to terms and conditions.  *See* SUF, ¶¶ 52-54; Parks Decl., ¶¶ 10 & 15, Exs. 9 & 14. She was therefore on inquiry notice of and assented to Amazon's Conditions of Use through her hundreds of orders on the site.  *See* *Salameno*, 2016 WL 4005783, at *1, 5-6.  Any use of a customer's account by an authorized user *must*

bind the customer, otherwise online purchasing would be impossible; any unscrupulous customer could simply claim that he didn't click the button and is therefore not bound by the terms of use or other obligations, including the obligation to pay.

Crucially, whenever Plaintiff used that account, including his placing the two orders of 1 Day Diet alleged in the Complaint, he was subject to the Conditions of Use. Federal courts have recognized that users of an online account are subject to the terms and conditions to which the account holder agreed. For example, in *Motise v. Am. Online, Inc.*, 346 F. Supp. 2d 563, 565-66 (S.D.N.Y. 2004), the court held that under a "derivative rights" theory, Plaintiff, who used an AOL account created by his stepfather, was subject to a forum selection clause in AOL's terms of service to which his stepfather agreed.[4] The *Motise* court further emphasized that "[a]ny other conclusion would permit individuals to avoid the Defendant's Terms of Service simply by having third parties create accounts and then using them as the Plaintiff did." *Id.* Plaintiff is therefore bound by the Conditions of Use to which the Nicosias' Prime Account agreed repeatedly and in several different ways.

### B.    Plaintiff's Claims Are Clearly Within The Scope Of The Arbitration Clause

Plaintiff's claims are clearly within the scope of the arbitration clause in the Conditions of Use. In determining whether an agreement to arbitrate applies to a given dispute, doubts must be resolved in favor of arbitrability. *Ace Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 29 (2d Cir. 2002) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983)); "The

---

[4] *See also Burcham v. Expedia, Inc.* No. 07-cv-1963, 2009 WL 586513, at *4 (E.D. Mo. Mar. 6, 2009) (rejecting the plaintiff's argument that he was not bound by the forum selection clause in Expedia's online agreement because he may have been using someone else's Expedia account when he made his booking and holding that plaintiff's "attempt to hold some other anonymous individual responsible for agreeing to the terms must fail. Other courts dealing with similar fact patterns have held that a person in [plaintiff's] position is still bound."); *Motise v. Am. Online, Inc.*, No. 04-cv-1494, 2005 WL 1667658, at *2 (E.D. Va. June 24, 2005) ("Plaintiff became a sub-licensee of the privileges and restrictions that AOL had conditionally granted to his step-father when Plaintiff signed onto his stepfather's account. As a sub-licensee, Plaintiff could have no greater rights than those of his step-father. . . . Just as Plaintiff's step-father had expressly agreed to and was bound by Defendant's Member Agreement, Plaintiff is also bound by the language in the Member Agreement.").

strong policy in favor of arbitration is even stronger where [as here] the arbitration clause itself is a broad clause that refers to arbitration 'all disputes arising out of an agreement.'" *Mann v. N.A.S.A. Int'l, Inc*., 99-cv-11936, 2000 WL 1182823, at *3 (S.D.N.Y. Aug. 21, 2000) (quoting *McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co*., 858 F.2d 825, 832 (2d Cir. 1988)).  The broad language contained in the arbitration agreement here requires submitting "any dispute" between Plaintiff and Amazon to arbitration: "[a]ny dispute or claim relating in any way to your use of any Amazon Service, or to any products or services sold or distributed by Amazon or through Amazon.com will be resolved by binding arbitration." (Dkt. 79 at 4; *see also, e.g.*, SUF, ¶ 124).  Courts have consistently emphasized that such language is "broad and far reaching." *Ekin*, 84 F. Supp. 3d at 1178 & n.9 (enforcing same agreement to arbitrate in same Conditions of Use at issue in this litigation); *see also Peters v. Amazon Servs., LLC*, 2 F. Supp. 3d 1165, 1173 (W.D. Wash. 2013) (noting that Amazon's Business Solutions Agreement with third-party sellers "is broad, applying to *any* dispute between the parties"), *aff'd*, -- F. App'x --, 2016 WL 5940052 (9th Cir. Oct. 13, 2016).

Many courts have compelled arbitration where arbitration agreements contain broad language covering any dispute.  *Kamakazi Music Corp. v. Robbins Music Corp.*, 684 F.2d 228, 229 (2d Cir. 1982) (holding that provision requiring arbitration of "any controversy or claim arising out of, or relating to this agreement or the subject matter thereof" in licensing contract required arbitration of statutory claims for violation of copyright); *Moore v. T-Mobile USA, Inc*., No. 10-cv-527, Dkt. No. 112 (E.D.N.Y. Sept. 28, 2012) (Townes, J.) (unpublished opinion) (holding that agreement to arbitrate "any and all claims or disputes . . . in any way related to or concerning the agreement, our services, devices or products" was "very broad" and encompassed plaintiff's privacy claim under the federal Telephone Consumer Protection Act), *recons. den.*, 2013 WL 55799 (Jan. 2, 2013), *aff'd*, 548 F. App'x 686 (2013).  Here, consistent with the terms of the arbitration agreement in the Conditions of Use, Plaintiff's claims clearly and undeniably stem from his "use of" the Amazon.com website. Dkt. No. 1, ¶ 15.  Plaintiff's Complaint also raises a "claim relating" to the purchase of "products . . . through Amazon.com." *Id.*  Thus, any dispute set forth in the Complaint must be decided by the arbitrator.

23

## C.      Any Challenges to the Conditions Of Use Must Be Decided By the Arbitrator

Once a court determines that parties have agreed to arbitrate and that a Plaintiff's claims fall within the scope of the arbitration agreement, the arbitrator must decide all remaining questions regarding enforceability or validity of the agreement.

Both the terms of the Conditions of Use and well-established case law require that any disputes regarding the enforceability or validity of the Conditions of Use go to the arbitrator.  First, as emphasized in Section V.B *supra*, the Conditions of Use state are broad and far reaching.  They also incorporate the American Arbitration Association's Supplementary Procedures for Consumer-Related Disputes ("AAA Rules"). *See, e.g.*, SUF, ¶ 124.  Those rules provide, in relevant part, that:

> (a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

> (b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

Rule 14, AAA Consumer Rules, *available at*: www.adr.org/consumer (last visited Mar. 8, 2017) (emphasis added).  Where "parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to the arbitrator."  *Laumann v. Nat'l Hockey League*, 989 F. Supp. 2d 329, 336 (S.D.N.Y. 2013); *see also Peng*, 2017 WL 722007, at * 12 (finding parties clearly and unmistakably delegated issues of arbitrability, including enforceability and validity of arbitration agreement, to arbitrator where parties incorporated by reference JAMS Streamlined Arbitration Rules and Procedures); *Cordas*, 2017 WL 658847, at *4-5 (holding that incorporation of AAA rules was clear and unmistakable evidence of an intent to delegate questions such as agreement validity to the arbitrator); *Cupples v. Valic Fin. Advisors, Inc.*, No. 13-cv-4501, 2014 WL 4662272, at *5 (E.D.N.Y. Sept. 18, 2014) (similar).  Here, by incorporating the AAA rules, the Conditions of Use expressly contemplated that all disputes – including those as to the enforceability or validity of the arbitration agreement – would be submitted to

24

the arbitrator.

Moreover, to the extent Plaintiff intends to challenge the validity of the Conditions of Use on grounds that they are illusory or void as an illegal contract, these are attacks on the validity of the contract as a whole, and thus must be resolved by the arbitrator.  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46, 449 (2006) (under the "rule of severability," "as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract [and] unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance"); *see also Damato v. Time Warner Cable, Inc.*, No. 13-cv-994, 2013 WL 3968765, at *5 (E.D.N.Y. July 31, 2013) (Court had "no occasion to consider the merits of this argument because, as the argument relates to a potential defect in the contract as whole, and not specifically to the arbitration clause, the matter must be decided by the arbitrator"); *Curry v. Volt Info. Scis., Inc.*, No. 07-cv-7158, 2008 WL 719214, at *2-3 (S.D.N.Y. Mar. 18, 2008) (challenge to right to unilaterally modify employment policies was to "the contract as a whole"; thus, the issue should be decided by an arbitrator). Judge Townes has already held that illusoriness and illegality are issues "reserved for the arbitrator." (Dkt. 79 at 16-17).  The Second Circuit's opinion explicitly did not reach this issue and there is no reason to revisit the argument that such challenges are subject to arbitration.  (Second Circuit Op., at 35 n.7) ("Nicosia appeals the district court's determination that challenges on the basis of contract illegality *ab initio* are subject to arbitration.  As we have decided that factual questions remain as to the formation of the agreement to arbitrate, we need not reach that question.").

## VI.    CONCLUSION

For each of the reasons stated above, the Court should grant Amazon's motion to compel arbitration.

Dated:  April 10, 2017

By:   MORGAN, LEWIS & BOCKIUS LLP

/s/Gregory T. Parks
Gregory T. Parks (admitted *pro hac vice*)
Jacqueline C. Gorbey (*pro hac vice* forthcoming)
1701 Market Street
Philadelphia, PA 19103
Tel: (215) 963-5000

Regina Schaffer-Goldman
101 Park Avenue
New York, NY  10178
Tel: (212) 309-6000

*Attorneys for Defendant Amazon.com, Inc.*