UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
DEAN NICOSIA, on behalf of himself and
all others similarly situated,

                    Plaintiff,                                        MEMORANDUM AND ORDER
                                                                     14-CV-4513 (ILG) (LB)

        *v.*

AMAZON.COM, INC.,

                    Defendant.
--------------------------------------------------------x

GLASSER, Senior United States District Judge:

        On January 30, 2013 and April 19, 2013, Plaintiff Dean Nicosia went on Amazon.com

and placed orders of 1 Day Diet, a product marketed as a weight-loss supplement, which

contained the harmful compound sibutramine. The account from which these purchases were

made was held in his wife's name and was previously enrolled in a program called "Amazon

Mom." As described below, to enroll in Amazon Mom, a user must accept the "Amazon Prime

Terms and Conditions," which incorporate an arbitration provision. Plaintiff subsequently

brought a putative class action against Defendant Amazon.com, Inc. (**"Amazon"**), asserting that

Amazon's sales of 1 Day Diet violated the Consumer Product Safety Act, 15 U.S.C. § 2051, *et

seq.*, and state law. After Amazon moved to compel arbitration, the matter was referred to the

Hon. Lois Bloom for a Report and Recommendation (**"R&R"**), which advised that the motion be

granted.

        The Court adopts the R&R's conclusion that arbitration be granted, finding that it is

supported by its careful analysis of the facts and the law which is manifest, and not impugned by

Plaintiff's objections to it, which are denied. The Court is driven to this conclusion upon its *de

novo* review of the evidentiary record, parties' motion and objection papers, and applicable legal

authority, as mandated by 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b)(3), for the reasons expanded upon below.

## STANDARD OF REVIEW

In deciding a motion to compel arbitration, "courts apply a 'standard similar to that applicable for a motion for summary judgment.' " *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). Accordingly, the Court will "consider all relevant, admissible evidence submitted by the parties and contained in the pleadings, depositions, answers to interrogatories, and admissions on file, together with … affidavits." *Id.* (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002)). "In so doing, the court must draw all reasonable inferences in favor of the non-moving party." *Id.* (citing *Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171-172 (2d Cir. 2011), *cert. denied*, 566 U.S. 1010 (2012)). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *Nicosia*, 834 F.3d at 229 (quoting *Bensadoun*, 316 F.3d at 175); *see also* 9 U.S.C. § 4. "But where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [the Court] may rule on the basis of that legal issue and 'avoid the need for further court proceedings.' " *Nicosia*, 834 F.3d at 229 (alterations omitted) (quoting *Wachovia Bank*, 661 F.3d at 172).

## BACKGROUND

### I. Factual Background

1. <u>The Nicosias' Amazon.com Account</u>

Plaintiff Dean Nicosia (**"Plaintiff"**) resides with his wife, Annemarie Nicosia (**"Annemarie"**), and his family in North Carolina. (D. Nicosia Dep. at 47:12-48:7, ECF No. 118-2). Before March 2012, he and his family lived in New York. (*Id.* at 46:25-47:24, 55:7-25).

**"Amazon.com"** is an online retail website and marketplace through which consumers may purchase hundreds of millions of products. (Ressmeyer Decl. ¶ 3, ECF No. 116). In order to make a purchase on Amazon.com, a customer must create an Amazon account or use an existing account. (*Id.* ¶ 5). It is not possible to check out as a "guest" on Amazon.com. (*Id.*).

On June 9, 2008, an Amazon account was created in the name of "Annemarie Nicosia" (the **"Account"**). (*Id.* ¶ 25). At all relevant times, the Account was used by both Plaintiff and Annemarie, although Plaintiff relied on Annemarie to manage it. (D. Nicosia Dep. at 138:9-139:9, 143:18-146:2; A. Nicosia Dep. at 45:3-11; 62:22-63:3, ECF No. 118-3; Def. 56.1 ¶ 57, ECF No. 115).[1]

2.    The Amazon Conditions of Use

It is undisputed that, at the time the Account was created, Amazon's Conditions of Use (**"Conditions of Use"** or **"COU"**) did not contain an arbitration provision. (Ressmeyer Decl. ¶ 15). On August 19, 2011, the following arbitration clause was added to the COU:

> **Any dispute or claim relating in any way to your visit to Amazon.com or to products or services sold or distributed by Amazon or through Amazon.com will be resolved by binding arbitration, rather than in court**, except that you may assert claims in small claims court if you qualify.

(*Id.*; Ressmeyer Decl. Ex. M, at AMZ000365, ECF No. 116-15) (bold in original). The arbitration provision was also accompanied by a class action waiver, which provides that "**any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action**." (Ressmeyer Decl. Ex. M, at AMZ000365) (bold in original). Finally, the COU contains a choice-of-law clause specifying that "the Federal Arbitration Act, applicable federal law, and the laws of the state of Washington … will govern

---

[1] In addition, three accounts were created in Plaintiff's name in 2009 and 2010. (Ressmeyer Decl. ¶¶ 21-24). For purposes of this motion, the Court is not concerned with these three accounts.

these Conditions of Use and any dispute of any sort that might arise between you and Amazon." (*Id.* at AMZ000366).

3. <u>Amazon Prime and Amazon Mom</u>

Amazon Prime (**"Amazon Prime"** or **"Prime"**) is a bundle of services, including free two-day shipping, discounted one-day shipping, and access to movies and television shows, offered to Amazon accountholders for an annual membership fee. (Ressmeyer Decl. ¶ 8).

Amazon Mom (**"Amazon Mom"** or **"Mom"**) was a free membership program launched by Amazon in September 2011 which offered limited, promotional Prime benefits. (*Id.* ¶ 13). By signing up for Mom, an accountholder could receive discounts on diapers and baby products, as well as three months of free two-day shipping. (*Id.*). By purchasing products on Mom, the accountholder could extend their free two-day shipping benefits to up to one year. (*Id.*).

Amazon Mom was explicitly promoted as a kind of free trial for Prime. In the promotional FAQ, the free shipping benefits were expressly referred to as "Amazon Prime benefits." (Ressmeyer Decl. Ex. J, at AMZ000369, ECF No. 116-10). Extending these benefits by making qualifying purchases on Mom gave the accountholder "more free months of Prime." (*Id.*). The Amazon Mom sign-up page contained text reading: "**After your free period, you'll be charged $79 for a year of Amazon Prime and Amazon Mom benefits** …." (*Id.* at AMZ000372, ECF No. 116-11). Bolded language near the sign-up button read: "**Amazon Prime membership continues until cancelled. If you do not wish to continue for $79/year, select 'Do not renew' from Your Account before your annual renewal date**." (*Id.*). Annemarie testified that, before this lawsuit was brought, she believed in her mind that Prime and Mom were the same program. (A. Nicosia Dep. at 59:24-60:3, 93:18-20). Amazon's Associate General Counsel for Marketing, too, viewed Mom as an "an addition" to Prime, whose "underlying program is a Prime program." (Ressmeyer Dep. at 204:11-13, ECF No. 118-1).

4

4.      <u>September 30, 2011: The Account enrolls in Amazon Mom</u>

Annemarie testified that, while she was pregnant with her second son, she heard about Amazon Mom from a friend, Albert Dennis (**"Dennis"**), who told her that the program offered diapers at a "good price." (A. Nicosia Dep. at 15:20-16:7, 58:8-11, 73:11-13). Annemarie gave Dennis her password (*id.* at 44:4-11), and Dennis told her that he was signing her up for Mom "to get diapers and formula if [she] needed it" (*id.* at 39:3-8). On September 30, 2011, Dennis enrolled Annemarie in Mom with her "permission." (*Id*. at 36:12-37:7):

> "Q:      And your friend Al Dennis told you, 'There's this Amazon.com Mom program where you can get a discount on diapers,' right?
>
> "A:      Yes, sir.
>
> "Q:      And that sounded pretty good to you?
>
> "A:      Yes, sir.
>
> "Q:      So your friend Al Dennis signed you up for that?
>
> "A:      Yes, sir.
>
> "Q:      And that was okay with you?
>
> "A:      Yes, sir."

(*Id*. at 58:8-18).

As of September 30, 2011, in order to sign up for Amazon Mom, a customer would be required to complete a two-step process. (Ressmeyer Decl. ¶ 27; Ressmeyer Decl. Ex. J, at AMZ000371-372). First, the customer would enter certain information about themselves and click a button that says "Continue." (Ressmeyer Decl. Ex. J, at AMZ000371). Directly above the "Continue" button was a line that read: "By clicking the **Continue** button, you acknowledge that you agree to the <u>Amazon Mom Terms and Conditions</u>." (*Id.*) (bold in original). The underlined

term was a hyperlink to the Amazon Mom Terms and Conditions (**"Mom T&C"**) (Ressmeyer

Decl. ¶ 28), which contained the following language:

> Welcome to the terms and conditions ("Terms") for Amazon Mom, which govern the Amazon Mom membership. Please note that your use of the Amazon.com website and the Amazon Mom membership are also governed by our Conditions of Use, … Amazon Prime Terms and Conditions, as well as all other applicable terms, conditions, limitations and requirements on the Amazon.com Web Site.

(Ressmeyer Decl. Ex. K, at AMZ000494, ECF No. 116-13). The Mom T&C further provide:

"Once your free shipping benefits have expired, you may continue to receive Amazon Prime

shipping benefits by enrolling in Amazon Prime for an annual membership fee of $79." (*Id.*).

Second, the customer was taken to a page where they must input their payment and

billing information and click a button that says, "Sign up for Amazon Mom." (*Id.* Ex. J, at

AMZ000372). Directly below this button was text that read: "By signing up, you acknowledge

that you have read and agree to the Amazon Prime Terms and Conditions …." (*Id.*). The

underlined term was a link to the Amazon Prime Terms and Conditions (**"Prime T&C"**)

(Ressmeyer Decl. ¶ 30), which contained the following language:

> Welcome to the terms and conditions ("**Terms**") for Amazon Prime. These Terms are between you and Amazon Services LLC and/or its affiliates ("**Amazon.com**" or "**Us**") and govern our respective rights and obligations. The Terms, together with applicable terms and conditions related to any promotional offers provided to you for use with Prime, constitute the entire agreement between you and Amazon.com related to the Prime membership. Please note that your use of the Amazon.com website and Prime membership are also governed by our Conditions of Use and Privacy Notice, as well as all other applicable terms, conditions, limitations, and requirements on the Amazon.com website, all of which (as changed over time) are incorporated into these Terms. If you sign up for a Prime membership, you accept these terms, conditions, limitations and requirements.

(Ressmeyer Decl. Ex. L, at AMZ000345, ECF No. 116-14). The underlined "Conditions of Use"

text was a hyperlink to the then-current version of the COU (Ressmeyer Decl. ¶¶ 31, 36), which

contained the arbitration clause reproduced above (Ressmeyer Decl. Ex. M).

The Amazon Mom sign-up flow is reproduced in **Appendix A** to this opinion.

5.      October 11, 2012: Annemarie signs up for a paid subscription of Prime

In September or October 2012, Annemarie's membership in Amazon Mom expired.

(Ressmeyer Decl. ¶ 33; Ressmeyer Dep. at 200:9-20).[2] On October 11, 2012, she signed up for a

paid subscription for Prime using her Account. (Ressmeyer Decl. ¶ 33). Plaintiff became aware

that the Account was enrolled in Prime some time in 2012. (D. Nicosia Dep. at 136:12-138:12).

6.      January and April 2013: Plaintiff purchases 1 Day Diet

1 Day Diet was a product promoted and sold for weight loss. On January 30, 2013 and

April 19, 2013, Plaintiff made two purchases of 1 Day Diet, using Annemarie's Account.

(Ressmeyer Decl. ¶ 41; Tusa Ex. B ¶ 5, ECF No. 122-2). In order to execute each purchase,

Plaintiff would have been required to click through a checkout page which contained a button

that said, "Place your order," and text which read, "By placing your order, you agree to

Amazon.com's privacy notice and conditions of use", with the underlined "conditions of use"

text hyperlinked to the COU. (Ressmeyer Decl. ¶ 16; Ressmeyer Decl. Ex. E, ECF No. 116-5;

Lin Decl. ¶ 4, ECF No. 117; Lin Decl. Ex. 1, ECF No. 117-1).

In November 2013, the U.S. Food and Drug Administration (**"FDA"**) issued a press

release stating that "laboratory analysis confirmed that '1 Day Diet' contains sibutramine," a

"controlled substance that was removed from the market in October 2010 for safety reasons."

U.S. Food & Drug Administration, "Public Notification: '1 Day Diet' Contains Hidden Drug

---

[2] There is an ambiguity in the record as to whether these benefits expired on September 30, 2012
or October 11, 2012. (Ressmeyer Dep. at 200:9-20).

Ingredient" (Nov. 21, 2013), *available at* https://www.fda.gov/drugs/medication-health-fraud/public-notification-1-day-diet-contains-hidden-drug-ingredient. The FDA has advised consumers using 1 Day Diet to "stop using this product immediately and throw it away." *Id.* Plaintiff testified that, in January 2014, after having a conversation with friends about 1 Day Diet, he performed a Google search of the product and came upon the November 2013 FDA press release. (D. Nicosia Dep. at 331:14-332:9). Nevertheless, he did not contact Amazon to request a return or refund. (*Id.* at 332:25-333:9).

## II.    Procedural History

Plaintiff brought this action on July 28, 2014, claiming that Amazon's sale of 1 Day Diet violated the Consumer Product Safety Act, 15 U.S.C. § 2051, *et seq.*, and state law. (Compl., ECF No. 1). On December 24, 2014, Amazon moved to dismiss on the grounds that, *inter alia*, "Plaintiff agreed to the Amazon's Conditions of Use … with each purchase at issue in this case." (ECF No. 52-1, at 8; ECF No. 60, at 2-4). On February 2, 2015, the Honorable Sandra L. Townes[3] granted Amazon's motion to dismiss, finding that "all of Plaintiff's claims are subject to mandatory arbitration[.]" 84 F.Supp.3d 142, 144 (E.D.N.Y. 2015). Judge Townes' decision was based primarily on the theory that Plaintiff consented to the Conditions of Use, including the arbitration provision, when he made his purchases through the Amazon.com checkout page. *See id.* at 150-153. Amazon did not raise in its motion to dismiss, and Judge Townes therefore did not consider, whether the arbitration clause applied by virtue of the Account's previous enrollments in Amazon Mom and/or Amazon Prime.

On appeal, the Second Circuit disagreed with Amazon and the District Court that the format of the checkout page was sufficient, as a matter of law, to bind Plaintiff to the Conditions

---

[3] This case was assigned to me on February 21, 2018.

of Use. *See* 834 F.3d at 238. At the same time, the Court of Appeals rejected Plaintiff's invitation to declare as a matter of law that no arbitration agreement was formed. *See id.* Instead, the Second Circuit found that "reasonable minds could disagree" as to whether the checkout page "provided reasonably conspicuous notice" of the Conditions of Use, so as to bind Plaintiff to the arbitration provisions set forth therein. 834 F.3d at 237-238. The Court of Appeals' reasoning makes it clear that the Court regarded "the reasonableness of notice" on the checkout page to be a question of fact that must be resolved by a jury. *Id.* at 238 & n. 6.

After discovery, Amazon brought this motion to compel arbitration and dismiss or, in the alternative, stay these proceedings. The matter was referred to the Honorable Lois Bloom pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, who issued a Report and Recommendation recommending that Amazon's motion be granted.

In support of its motion, Amazon argued that Plaintiff was bound by the Prime T&C because Annemarie's Account, from which the purchases were made, had enrolled in Amazon Mom and Amazon Prime. (ECF No. 114, at 18-22; ECF No. 123, at 4-5). Amazon styled this argument as its "derivative rights" theory. (ECF No. 123, at 4). The R&R did not make a definitive recommendation with respect to Amazon's "derivative rights" theory. (R&R at 28-30). Instead, the R&R recommended that the motion be granted on the grounds that Plaintiff agreed to the COU directly through the checkout page. Specifically, the R&R accepted Amazon's argument that Plaintiff agreed to the COU by making purchases after this lawsuit was commenced, and hence after he acquired actual notice of the fact that the COU incorporated an arbitration provision. (*Id.* at 19-22). Alternatively, the R&R accepted Amazon's argument that Plaintiff was on constructive notice of the COU by virtue of his status as a repeated user of Amazon who frequently encountered the checkout page when shopping online. (*Id.* at 22-25).

Plaintiff timely objected to the R&R, although he did not specifically object to the R&R's treatment of Amazon's "derivative rights theory." (ECF No. 159, at 1-2). Amazon reasserted its "derivative rights" argument in its statement in support of the R&R and reply memorandum to Plaintiff's objections. (ECF No. 158, at 2; ECF No. 160, at 16-20).

**DISCUSSION**

In reviewing a magistrate judge's report and recommendation with respect to a dispositive matter, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). As to those sections of the magistrate's report to which no objections are made, the district court may adopt such sections "as long as the magistrate's decision was not 'facially erroneous.' " *Aminov v. EC Commodities Corp.*, No. 16-CV-4800 (AMD) (SMG), 2018 WL 542245, at *1 (E.D.N.Y. Jan. 24, 2018) (quoting *Market v. Lapolla Industries, Inc.*, No. 12-CV-4622 (JS) (AKT), 2016 WL 324968, at *3 (E.D.N.Y. Jan. 26, 2016)). However, the Court, in its discretion, may also review such sections *de novo*. *See Mathews v. Weber*, 423 U.S. 261, 270-271 (1976); *U.S. v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 39 (2d Cir. 1997) ("Although defendant did not object to the magistrate judge's recommendation, … [t]he record indicates that the district court made a *de novo* determination of the Report and Recommendation …. The court's review was well within its discretion"). At the conclusion of its review, the district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3).

In this case, the Court exercises its discretion to review *de novo* Amazon's "derivative rights" argument. The Court finds that this argument has merit, and therefore compels arbitration on these grounds.

## I.    Substantive Legal Principles

1.    The Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*

Section 2 of the FAA declares that a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This mandate is enforced by the two sections that follow. Under Section 3, courts must, upon the request of a party, stay litigation in any proceedings in which the underlying claims are arbitrable. *See id.* § 3. Under Section 4, the court must also, on request, issue an order compelling such arbitration "in the manner provided for in such agreement." 9 U.S.C. § 4. Additionally, because the purpose of the FAA was to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts," *Granite Rock Co. v. International Broth. of Teamsters*, 561 U.S. 287, 302 (2010) (quoting *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 478 (1989)), the statute preempts defenses to enforceability (such as unconscionability) which single out arbitration clauses for disfavored treatment, *see Perry v. Thomas*, 482 U.S. 483, 492 n. 9 (1987).

To determine whether arbitration must be compelled, a court must resolve two issues: whether the parties agreed to arbitrate, and whether the dispute at hand falls within the scope of the arbitration agreement. *See Mehler v. Terminix Intern. Co. L.P.*, 205 F.3d 44, 47 (2d Cir. 2000). Both questions are decided under state contract law. *See Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522, 526 (2d Cir. 2011) ("[I]n deciding whether a contractual obligation to arbitrate exists, 'courts should generally apply state-law principles that govern the formation of contracts' ") (quoting *Mehler*, 205 F.3d at 48); *Bechtel do Brasil Construcoes Ltda. v. UEG Araucaria Ltda.*, 638 F.3d 150, 154 (2d Cir. 2011) (applying "state-

law principles of contract interpretation" to determine "the scope of the parties' intention to arbitrate"). In this case, Washington law applies. *See Nicosia*, 834 F.3d at 231.

On questions of contract *formation*—whether a valid arbitration agreement exists in the first place—state law must be applied neutrally, that is, without any special presumption that the parties agreed to arbitrate. *See Citigroup Global Markets Inc. v. Abbar*, 761 F.3d 268, 274 (2d Cir. 2014) ("Because the parties here are disputing the existence of an obligation to arbitrate, not the scope of an arbitration clause, the general presumption in favor of arbitration does not apply"); *Applied Energetics,* 645 F.3d at 526 ("[T]he presumption [of arbitrability] does not apply to disputes concerning whether an agreement to arbitrate has been made"). By contrast, on questions of contract *scope*—what the arbitration agreement says—the FAA imposes a presumption of arbitrability, pursuant to which "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses H. Cone*, 460 U.S. at 24-25; *see also Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391, 395 (2d Cir. 2015).

2.    Adhesive arbitration agreements

As any internet user knows, website terms and conditions are burdensomely long. One rarely reads the fine print when they create a social media account, buy an e-book or movie, use a ridesharing service, or download a mobile app. This phenomenon is not new to the internet age, but is endemic to standardized form agreements wherever they appear, from credit card terms to car rentals. These agreements are contracts of adhesion, in that they contain preprinted terms offered on a take-it-or-leave-it basis, which, in light of the parties' respective bargaining positions, are not realistically susceptible to negotiation or customization. *See generally* Todd D. Rakoff, *Contracts of Adhesion: An Essay in Reconstruction*, 96 Harv. L. Rev. 1173, 1177 (1983).

Standardized adhesion contracts are necessary in a busy, commercial society. The costs in time and effort of scrutinizing non-essential boilerplate are seldom worth the benefits. *See*

Wayne R. Barnes, *Toward a Fairer Model of Consumer Assent to Standard Form Contracts: In Defense of Restatement Subsection 211(3)*, 82 Wash. L. Rev. 227, 254-256 (2007) ("[H]umans have limited capacities both for the amount of information they can consider in their decisions and for processing the information that they do take into account"); Michael I. Meyerson, *The Efficient Consumer Form Contract: Law and Economics Meets the Real World*, 24 Ga. L. Rev. 583, 596-600 (1990). Instead, it is usually more economical to "trust … the good faith" of the merchant and "the tacit representation that like terms are being accepted regularly by others similarly situated." Restatement (Second) of Contracts § 211 cmt. b (1981). Enforcing such terms, even when they are not actually read or understood, permits consumers to trade information for convenience.

The traditional view of adhesion contracts was that the consumer had a " 'duty to read' the document before signing it," and that his "signature on a document … which he had the opportunity to read, will be taken to signify his assent…." Rakoff, *supra*, at 1185-87. The modern view accepts that this is a legal fiction: consumers do not read boilerplate. The reality is that there is a true meeting of the minds as to only a small number of terms (price, quantity, *etc.*), and the consumer, by adopting the boilerplate as-is, "delegate[s]" to the merchant the power to make the rest. W. David Slawson, *Standard Form Contracts and Democratic Control of Lawmaking Power*, 84 Harv. L. Rev. 529, 533 (1971). Llewellyn likened the process to the offering of a blank check: the consumer offers his "blanket assent" to whatever terms the merchant deems appropriate, provided they are not "unreasonable or indecent." Karl Llewellyn, *The Common Law Tradition: Deciding Appeals* 370 (1960). Just as "[a] debtor who delivers a check to his creditor with the amount blank does not authorize the insertion of an infinite figure," a consumer who enters into an adhesive contract cannot be presumed to assent to terms that are "bizarre or oppressive." Restatement (Second) of Contracts § 211 cmt. f. In keeping with this

principle, courts in Washington and elsewhere will enforce adhesive terms if they satisfy a threshold of substantive reasonableness—that is, if they are not unconscionable. *See McKee v. AT & T Corp.*, 164 Wash.2d 372, 396-401 (Wash. 2008); *Zuver v. Airtouch Communications, Inc.*, 153 Wash.2d 293, 315-319 (Wash. 2004). *See also* Restatement (Second) of Contracts § 211(3) & cmt. f.

Plaintiff raises no unconscionability argument here, but this prompts one to inquire why Plaintiff has objected so strenuously to arbitration at all. The trope that arbitrators are biased toward defendants does not appear to have been borne out by recent scholarship. *See* Peter B. Rutledge, *Whither Arbitration?*, 6 Geo. J. L. & Pub. Pol'y 549, 556-560 (2008) (surveying the data and concluding that "most measures—raw win rates, comparative win rates, comparative recoveries, and comparative recoveries relative to amounts claimed—do not support the claim that consumers and employees achieve inferior results in arbitration compared to litigation"); Sarah Rudolph Cole, *On Babies and Bathwater: The Arbitration Fairness Act and the Supreme Court's Recent Arbitration Jurisprudence*, 48 Hous. L. Rev. 457, 471-476 (2011) (surveying data on consumer arbitration and concluding that "consumers can save money while achieving results similar to or better than they would in court"); Christopher R. Drahozal & Samantha Zyontz, *An Empirical Study of AAA Consumer Arbitrations*, 25 Ohio St. J. on Disp. Resol. 843, 908-916 (2010) (finding no evidence of arbitrator bias in favor of repeat business in AAA consumer arbitrations). Perhaps the true motivation for resisting arbitration lies the arbitration clause's accompanying class action waiver. Indeed, a number of state high courts have found such clauses unconscionable where they appear in adhesive consumer contracts, reasoning that they make it uneconomical for small-dollar plaintiffs to pursue relief. *See, e.g., Scott v. Cingular Wireless*, 160 Wash.2d 843, 854-857 (Wash. 2007); *Muhammad v. County Bank of Rehoboth Beach, Delaware*, 189 N.J. 1, 18-24 (N.J. 2006); *Discover Bank v. Superior Court*, 36 Cal.4th

148, 158-163 (Cal. 2005). However, this line of reasoning, whatever its merits, was rejected by the Supreme Court in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) (abrogating *Discover Bank*).

Therefore, the scope of the Court's review in analyzing Amazon's adhesive arbitration agreement is very limited. If the Court is satisfied that an arbitration agreement exists and that it covers the dispute in issue, it must stay or dismiss these proceedings and compel arbitration in accordance with the agreement's terms. *See* 9 U.S.C. §§ 2-4.

3.    Hybridwrap agreements

While "new commerce on the Internet … has not fundamentally changed the principles of contract," *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004), it has exposed courts to novel applications of those principles. Many online agreements merely present the user with a hyperlink to their terms and conditions, rather than displaying the terms themselves. "Where an offeree does not have actual notice of certain contract terms, he is nevertheless bound by such terms if he is on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019). A website user is deemed to be on inquiry notice of contract terms so long as the "design and content" of the webpage renders "existence" of those terms "reasonably conspicuous." *Nicosia*, 834 F.3d at 233.

Some websites—such as Amazon—prompt the user to manifest their assent to particular terms by engaging in some dual-purpose action, such as creating an account, *see, e.g., Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 70-71, 81-82 (2d Cir. 2017); *Berkson v. Gogo LLC,* 97 F.Supp.3d 359, 372-373, 374-375 (E.D.N.Y. 2015), executing a purchase order, *see, e.g., Nicosia*, 834 F.3d at 227, 241-242, or downloading an application, *see, e.g., Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir. 2002). In determining whether these "hybridwrap"

terms should be enforced, the focal point of the inquiry is whether "a reasonably prudent offeree would know that the [terms and conditions] governed," such that their performance of the action (such as creating the account or executing the purchase) "manifested implied assent to the additional terms." *Nicosia*, 834 F.3d at 236. Courts will give effect to hybridwrap terms where the button required to perform the action manifesting assent (*e.g.*, signing up for an account or executing a purchase) is located directly next to a hyperlink to the terms and a notice informing the user that, by clicking the button, the user is agreeing to those terms. *See, e.g., May v. Expedia, Inc.*, No. 16-CV-1211 (RP) (ML), 2018 WL 4343445, at *3 (W.D. Tex. Jul. 19, 2018), *report and recommendation adopted*, 2018 WL 4343427 (W.D. Tex. Aug. 27, 2018); *Church v. Hotels.com L.P.*, No. 18-CV-18 (RMG), 2018 WL 3130615, at *2 (D.S.C. Jun. 26, 2018); *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-CV-4570 (LAK) (KHP), 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018), *appeal dismissed*, 763 Fed. Appx. 101 (2d Cir. Mar. 7, 2019); *Selden v. Airbnb, Inc.*, No. 16-CV-933 (CRC), 2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016); *Forby v. One Technologies, LP*, No. 15-CV-757 (DRH) (PMF), 2016 WL 1321194 (S.D. Ill. Apr. 5, 2016); *Crawford v. Beachbody, LLC*, No. 14-CV-1583 (GPC) (KSC), 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014); *Starke v. Gilt Groupe, Inc.*, No. 13-CV-5497 (LLS), 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014). The more the hybridwrap design diverges from this basic layout—such as by placing the notice further away from the action button, cluttering the screen with potentially distracting content, or omitting the language explicitly saying that by performing the action the user agrees to be bound by the terms—the less likely courts are to find that inquiry notice has been provided. *See, e.g., Nicosia*, 834 F.3d at 236-237 (holding that Amazon's checkout page was not sufficient as a matter of law to place a user on inquiry notice of the COU, because the notice and accompanying hyperlink was "not directly adjacent to the 'Place your order' button so as to indicate that a user should construe clicking as

acceptance," and the page was spatially cluttered with unrelated options and promotions which rendered the notice not "conspicuous in light of the whole webpage"); *Lee v. Intelius Inc.*, 737 F.3d 1254, 1261-62 (9th Cir. 2013) (declining to enforce hybridwrap terms, where the website did not explicitly say that the user was agreeing to the terms and conditions); *Wilson v. Huuuge, Inc.*, 351 F.Supp.3d 1308, 1314-15 (W.D. Wash. 2018) (notification merely stated "Read our Terms of Use," rather than explicitly indicating that downloading the application meant agreeing to the terms of use, and the notice was not located near the download button), *appeal filed*, No. 18-36017 (9th Cir.), *stay granted*, 2019 WL 998319 (W.D. Wash. Mar. 1, 2019).

## II.     Plaintiff's Evidentiary Objections

Plaintiff raises several evidentiary objections in his Opposition to Amazon's Local Rule 56.1 Statement of Undisputed Facts, as well as his memorandum of law opposing this motion. Because the Court grounds its decision solely in Amazon's "derivative rights" argument, some of these objections are rendered academic. Only three need be addressed here: (1) Plaintiff's objections (Pl. 56.1 Opp. ¶¶ 15, 18, 94-95, ECF No. 119; ECF No. 121, at 17) to the images of the Prime sign-in flow (Ressmeyer Decl. Exs. B, C, D, N); (2) Plaintiff's objections (Pl. 56.1 Opp. ¶¶ 83-84, 86; ECF No. 121, at 17) to the images of the Mom sign-in flow (Ressmeyer Decl. Ex. J); and (3) Plaintiff's objections (Pl. 56.1 Opp. ¶¶ 29, 94-95) to the declaration of Karen Ressmeyer, Amazon's Associate General Counsel for Marketing and Prime, insofar as it describes the process to sign up for Prime. (Ressmeyer Decl. ¶¶ 19, 35).

1.     <u>Amazon Prime sign-up flow</u>

Amazon did not produce a copy of the Prime sign-up flow that a customer would have seen on October 11, 2012, claiming that it "does not have a depiction" of these webpages. (Ressmeyer Decl. ¶ 35). Instead, Amazon provided several "current and historical examples" of the Prime sign-up screens. (Ressmeyer Decl. Exs. ¶ 11 & Exs B, C, D, N). But the record shows

that none of these screens could have been the ones viewed by Annemarie when she re-enrolled in Prime in 2012.[4] Nor does the record even contain a statement that these Prime sign-in screenshots are *similar* to the one Annemarie would have seen.[5] As such, the Court finds that the Prime sign-up screens produced by Amazon lack relevance. Therefore, the Court cannot consider them in adjudicating this motion.

2. Amazon Mom sign-up flow

Plaintiff objects that the Mom sign-up flow produced by Amazon bears a 2012 copyright notice, and therefore could not have been the exact screen that Dennis viewed when the Account enrolled in Mom on September 30, 2011. (Pl. 56.1 Opp. ¶ 83). But Ressmeyer's declaration establishes that the same sign-up flow "was in place on September 30, 2011." (Ressmeyer Decl. ¶ 27). Therefore, Plaintiff's objections to the Mom sign-up images are denied.

3. Ressmeyer's description of the Prime sign-up process

Other than the Prime sign-up images, which the Court disregards as irrelevant, *see* Discussion II.1, *supra*, the only other evidence pertaining to the 2012 Prime sign-up process is Ressmeyer's description of the process in her declaration.[6]

---

[4] Exhibit B lists an annual Prime fee of $99; the fee was raised from $79 in March 2014. (Ressmeyer Decl. Ex. B, AMZ000268; Ressmeyer Dep. at 233:6-234:5; Def. 56.1 ¶ 13). Exhibit C contains a 2017 copyright notice. (Ressmeyer Decl. Ex. C; Ressmeyer Dep. at 228:2-230:6). Ressmeyer conceded at her deposition that Exhibit D could not have been the "page Mrs. Nicosia would have seen." (Ressmeyer Dep. at 235:23-236:3). Exhibit N was Prime's "current" sign-in page as of April 6, 2017. (Ressmeyer Decl. ¶ 35).

[5] Although Ressmeyer remarked at her deposition that one of the sign-up screens produced by Amazon had the same "format" as the one used in 2012 (Ressmeyer Dep. at 236:18-19), she did not elaborate on this comment, and it is impossible for the Court to tell what she meant.

[6] Ressmeyer states that, in order to sign up for Prime, a user "would have been required to click a button that stated 'Signup now' or 'Confirm' (or similar language indicating that the user was about to start a Prime membership)." (Ressmeyer Decl. ¶ 35). "Beneath that button was language substantially similar to the following: 'By signing up, you acknowledge that you have read and

However, reliance on these statements would contravene the best evidence rule, codified in Federal Rule of Evidence 1002, which provides that "[a]n original writing is required in order to prove its content unless these rules or a federal statute provide otherwise." *See Rui Chen v. Premier Financial Alliance, Inc.*, No. 18-CV-3771 (YGR), 2019 WL 280944, at *1 n. 3 (N.D. Cal. Jan. 22, 2019) (finding that declaration of defendant's attorney describing online arbitration agreement was precluded by the best evidence rule). Although an exception to the best evidence rule provides that "[a]n original is not required and other evidence of the content of a writing, recording, or photograph is admissible if … all the originals are lost or destroyed, and not by the proponent acting in bad faith," Fed. R. Evid. 1004, Amazon has not provided even the faintest excuse for its failure to produce the 2012 Prime sign-up flow. *See Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 354 F.Supp.3d 375, 382 (S.D.N.Y. 2018) (where "nothing in the declaration[] [or] deposition testimony … addresses what happened to the original [document], … the 'factual predicates' for invoking the Rule 1004 exception are not satisfied").

Even if Ressmeyer's description of the Prime sign-up process were not precluded by the best evidence rule, it would not be sufficient to establish, *as a matter of law*, that Annemarie entered into a binding arbitration agreement when she signed up for Prime. *See Rui Chen*, 2019 WL 280944, at *3 ("Defendants have not offered evidence explaining the design and content of the webpage …. [T]he Court cannot determine other factors that might contribute to determining plaintiffs' notice of the terms, such as the size of the font or other aspects of the appearance and presentation of the terms online"). The declaration is certainly probative as to how the Prime sign-up screen would have appeared in 2012, but it is not conclusive. At most, it raises a question of fact as to the appearance of the Prime sign-up screen in 2012. *See id.* Under the FAA, such

agree to the <u>Amazon Prime Terms and Conditions</u>….," with the underlined text hyperlinked to the Prime T&C. (*Id.*).

questions must be submitted to trial. *See* 9 U.S.C. § 4; *Nicosia*, 834 F.3d at 229; *Bensadoun*, 316 F.3d at 175. Because the Court finds that arbitration can be compelled on other grounds, *see* Discussion III-IV, *infra*, it need not give further consideration to the 2012 Prime sign-up process or Ressmeyer's descriptions thereof.

## III. Annemarie Entered Into an Arbitration Agreement with Amazon

Amazon argues that Annemarie assented to the arbitration provision when she (through her agent, Dennis) enrolled in Mom in 2011. For the reasons that follow, the Court agrees.

1. <u>Dennis acted as Annemarie's agent</u>

Under Washington law, "[a]n agent can bind his or her principal to a contract when the agent has either actual or apparent authority." *Steadman v. Green Tree Servicing, LLC*, No. 14-CV-854 (JLR), 2015 WL 2085565, at *6 (W.D. Wash. May 5, 2015) (citing *King v. Riveland*, 125 Wash.2d 500, 886 P.2d 160, 165 (Wash. 1994)).[7] An agent acts with actual authority where, "at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Revitalization Partners, LLC v. Equinix, Inc.*, No. 16-CV-1367 (JLR), 2017 WL 823291, at *4 (W.D. Wash. Mar. 2, 2017) (quoting Restatement (Third) of Agency § 2.01 (2006)).

Here, Annemarie testified that Dennis told her about the Mom program (A. Nicosia Dep. at 16:4-7, 58:8-11, 73:11-13), that she gave Dennis the password to her Account (*id.* at 44:4-11), that Dennis told her he was signing her up for Mom (*id.* at 39:3-8), and that he did so with her "permission" (*id.* at 37:1-5). From this record, there can be no dispute that Annemarie authorized Dennis to sign her up for Mom, thus establishing a principal-agent relationship. *See Hofer v.*

---

[7] Neither party disputes that Washington law applies to questions of agency in this case. (ECF No. 114, at 16; ECF No. 121, at 21).

*Gap, Inc.*, 516 F.Supp.2d 161, 175 (D. Mass. 2007) (holding that plaintiff was bound by Expedia's terms and conditions because plaintiff's friend booked plaintiff's travel arrangements on Expedia's website); *Adsit Co., Inc. v. Gustin*, 874 N.E.2d 1018, 1023-24 (Ind. App. 2007) (where defendant provided her credit card to her mother-in-law to complete an online purchase "on her behalf," the defendant was bound by the online agreement's forum selection clause).

2.      To sign up for Amazon Mom, a user must agree to an arbitration clause

The Court now turns to whether Annemarie (through her agent, Dennis) agreed to be bound by the arbitration provision. This provision appears in the COU, which is expressly "incorporated" into the Prime T&C. Therefore, the relevant question is whether the Mom sign-up flow provided reasonably conspicuous notice of the Prime T&C and required the user to manifest assent to those terms. *See Starke*, 913 F.3d at 289; *Nicosia*, 834 F.3d at 233.

The Court has no difficulty finding that it does. The second Mom sign-up screen contains a notice directly below the "Sign up for Amazon Mom" button, which reads, "By signing up, you acknowledge that you have read and agree to the Amazon Prime Terms and Conditions ...." The proximity of this notice to the "Sign up" button would make it very difficult for any user to miss, and its explicit use of contract-forming language, *viz.*, "you … agree to the Amazon Prime Terms and Conditions," leaves no doubt as to the legal consequences of proceeding with the transaction. Courts presented with similar hybridwrap interfaces have routinely found them sufficient. *See May*, 2018 WL 4343445, at *3, *Church*, 2018 WL 3130615, at *2; *Bernardino, supra*; *Selden*, 2016 WL 6476934, at *5; *Forby, supra*; *Crawford*, 2014 WL 6606563, at *3; *Starke*, 2014 WL 1652225, at *3.

Inquiry notice of the arbitration clause is buttressed by the first page of the sign-in flow, which contains a "Continue" button and, directly above that button, a notice that, "By clicking the **Continue** button, you acknowledge that you agree to the Amazon Mom Terms and

Conditions." This notice links to the Mom T&C, which states that "your use of … the Amazon Mom membership [is] governed by our Conditions of Use [and the] Amazon Prime Terms and Conditions." Although it does not appear that the Mom T&C link directly to the Prime T&C or the COU, they provide additional notice that, by proceeding with the enrollment, the user agrees to be bound by these terms.

Therefore, by signing up for Mom, Annemarie (through her agent) agreed to be bound by Amazon's arbitration clause. For the convenience of the reader, the remainder of this opinion shall refer to this agreement as the **"Amazon Mom Arbitration Agreement"**.

3.  <u>The Amazon Mom Arbitration Agreement applies to non-Prime eligible purchases</u>

Plaintiff objects that the Amazon Mom Arbitration Agreement and the Prime T&C are "inapplicable and irrelevant" to this case because Plaintiff's purchases of 1 Day Diet were not Prime-eligible. (Pl. 56.1 Opp. ¶¶ 22, 30, 81-83, 90; Ressmeyer Dep. at 138:14-139:23, 209:13-15). But this cramped reading of the agreement's scope cannot withstand a plain reading of its text. Nothing in the COU, the Prime T&C, the Mom T&C, or the Amazon Mom offer terms limits the scope of the arbitration clause to purchases for Prime-eligible products. The COU, which are "incorporated" into the Prime T&C, and to which Annemarie agreed when the Account enrolled in Mom, broadly state that "**[a]ny dispute or claim relating in any way to your visit to Amazon.com or to products or services sold or distributed by Amazon or through Amazon.com will be resolved by binding arbitration….**" Clearly, purchases of *all* products on Amazon.com—whether Prime-eligible or not—fall within this provision's plain sweep.

4. <u>The Amazon Mom Arbitration Agreement continues to apply when a user enrolls in a paid Prime subscription</u>

Plaintiff further objects that Annemarie's enrollment in Amazon Mom is "irrelevant" because her membership in the program expired in 2012, prior to Plaintiff's purchases of 1 Day Diet (Pl. 56.1 Opp. ¶¶ 81-88). The Court disagrees. When a user signs up for Amazon Mom—essentially a temporary, free trial of Prime, *see* Background I.3, *supra*—and thereby agrees to an arbitration provision, that arbitration provision continues to govern if the user signs up for a paid Prime subscription after their free trial expires.

We turn first to the relevant contractual language. The COU itself places no temporal limitations on the arbitration clause. It states only that "[a]ny dispute or claim relating in any way" to the accountholder's use of Amazon "will be resolved by binding arbitration." A literal reading of this clause, therefore, would suggest that it applies to all future disputes.

The Prime T&C provide that "[t]he [Prime T&C], together with applicable terms and conditions related to any promotional offers provided to you for use with Prime, constitute the entire agreement between you and Amazon.com *related to the Prime membership*" (emphasis added). The Prime T&C further provide that, "[*i*]*f you sign up for a Prime membership*, you accept these terms, conditions, limitations and requirements" (emphasis added). This emphasized language must be read in conjunction with the Mom T&C, which provide: "Once your free shipping benefits have expired, you may *continue* to receive Amazon Prime shipping benefits by enrolling in <u>Amazon Prime</u> for an annual membership fee of $79" (emphasis added). Read together, this language refutes Plaintiff's argument that, by signing up for Amazon Mom, an accountholder is only governed by the Prime T&C for the duration of their "free" Amazon Mom benefits. Instead, under these terms, one who enrolls in a paid subscription after their free trial

expires, and thereby reactivates their "Prime membership," remains bound by the Prime T&C to which they previously agreed.

Because nothing in the *text* of the Amazon Mom Arbitration Agreement supports the temporal limitation urged by Plaintiff, any such argument must rely on *context*. In other words, Plaintiff's argument must be that a reasonable consumer entering into an arbitration agreement as part of a free trial would not understand the clause to survive if they convert to a paid subscription. But Plaintiff cites no authority for this proposition, and the Court has difficulty accepting it. It is fairly routine for vendors to offer free trials of certain goods or services, which automatically roll over to paid subscriptions unless the consumer affirmatively cancels. There can be no doubt that one who agrees to a contract term as part of a free trial remains bound if they automatically convert to a paid subscription. *See, e.g., E. G. Ground Management v. YCharts, Inc.*, No. 15-CV-55 (RGK), 2015 WL 13357669 (C.D. Cal. May 8. 2015) (limitation of liability clause, which accountholder agreed to in order to sign up for free trial, barred negligence claims against vendor which accrued after accountholder upgraded to paid subscription).

Here, Amazon Mom was described by Amazon as, and understood by Annemarie to be, a kind of Prime membership. *See* Background I.3, *supra*. The sign-up screen for Mom read: "**After your free period, you'll be charged $79 for a year of Amazon Prime and Amazon Mom benefits**," and "**Amazon Prime membership continues until cancelled**." If Annemarie's re-enrollment in Prime were simply automatic at the expiration of her Amazon Mom membership, there is no question that she would remain bound by the Prime T&C. The fact that she *manually* re-enrolled in October 2012 only makes the case for arbitrability stronger. By affirmatively rolling her Mom membership over into a paid Prime subscription, Annemarie implicitly manifested an assent to remain bound by whatever contractual obligations previously governed the Account while it was enrolled in Mom.

In arriving at this conclusion, the Court does not hold that the 2012 sign-up process for Prime, on its own, provided sufficient inquiry notice of the Prime T&C. As previously stated, there is insufficient evidence to support this conclusion as a matter of law. *See* Discussion II.1, II.3, *supra*. However, in light of the broad presumption of arbitrability that governs to the scope and meaning of an arbitration agreement, *Moses H. Cone*, 460 U.S. at 24-25; *Holick*, 802 F.3d at 395, the Court finds that the Amazon Mom Arbitration Agreement remained effective when Annemarie re-enrolled in Prime.

## IV.    Plaintiff is Equitably Estopped from Avoiding Arbitration

The preceding analysis shows that Annemarie entered into a binding arbitration agreement by signing up for Amazon Mom and that the agreement covered purchases of products, whether Prime-eligible or not, made after Annemarie re-enrolled in Prime in 2012. Thus, if it were Annemarie herself who purchased 1 Day Diet, she would be bound to arbitrate this dispute. The question at the heart of Amazon's "derivative rights" argument is whether the Amazon Mom Arbitration Agreement can be circumvented when it is a third party (*i.e.*, the Plaintiff), rather than Annemarie herself, who makes purchases on the Account.

To ask this question is to answer it. Password-sharing is a "ubiquitous, useful, and generally harmless" activity that "millions of people" engage in, *United States v. Nosal*, 844 F.3d 1024, 1048 (9th Cir. 2016) (Reinhardt, J., dissenting), but it cannot be used as a back door to undermine the contractual landscape governing internet commerce. Plaintiff protests that "Amazon anthropomorphizes [the] Prime account" and that it is "individuals … not inanimate objects," who "consent to arbitration." (ECF No. 121, at 1). But the entire purpose of an "account" on a platform like Amazon is to assume virtual personhood—to enter into contracts and, crucially, to *remain bound* by the contracts to which it has previously, and with due

authority, agreed.[8] If the validity of these contract terms waxed and waned depending on the identity of the human user behind the screen, it would impose a cloud of uncertainty over any contract formed over the internet. Any individual could avoid the terms of a website by simply logging on to a friend's or relative's account instead of creating their own. Common sense dictates that this could not possibly be the rule; and where common sense goes, the law must follow.

Although Plaintiff himself did not enter into the arbitration agreement described above, "a nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.' " *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (quoting *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980)). State law, rather than the federal substantive law of arbitrability, furnishes the relevant contract principles. *See Arthur Andersen v. Carlisle*, 556 U.S. 624, 630 (2009) (the FAA does not "purport[] to alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)").

Several district courts have considered facts analogous to this case and have held that a third-party user of an account is bound by the terms governing the account. *See Roberts v. eBay*, No. 14-CV-4904 (HMH) (MGB), 2017 WL 9289378, at *8 n. 6 (D.S.C. Jul. 29, 2017); *Burcham v. Expedia, Inc.*, No. 07-CV-1963 (CDP), 2009 WL 586513, at *4 (E.D. Mo. Mar. 6, 2009); *Motise v. America Online, Inc.*, No. 04-CV-1494, 2005 WL 1667658, at *2 (E.D. Va. Jun. 24, 2005) (*Motise II*); *Motise v. America Online, Inc.*, 346 F.Supp.2d 563, 565-566 (S.D.N.Y. 2004) (*Motise I*). In *Motise I*, the case upon which all of the others rely, the Court held that the plaintiff,

---

[8] The caveat that a website account is only bound by past agreements made with *due authority* prevents the situation where, for example, an accountholder is made liable for an unauthorized purchase.

who used his stepfather's AOL account, was bound by a forum-selection provision appearing in the account's member agreement. *See* 346 F.Supp.3d at 566. The court reasoned that the plaintiff was a "sub-licensee" of his stepfather and "could not, therefore, have greater rights" than his stepfather. *Id.*; *see also Metropcs Wireless, Inc. v. Virgin Mobile USA, L.P.*, No. 08-CV-1658 (SAF), 2009 WL 3075205, at *22 (N.D. Tex. Sept. 25, 2009) (observing that the situation in *Motise I* was "analogous to an assignment [of the license] because the user [stood] in the shoes of the account holder to assume his place in the contract with the service provider"). The court further held that "[a]ny other conclusion would permit individuals to avoid the Defendant's Terms of Service simply by having third parties create accounts and then using them as the Plaintiff did." *Motise I*, 346 F.Supp.2d at 566. The Court agrees with the result of *Motise I*, but it finds that the doctrine of equitable estoppel, rather than the licensee-sublicensee metaphor employed by that court, more accurately captures the legal principles at work.[9]

1.    Traditional equitable estoppel

Equitable estoppel has been formulated differently in different contexts. The indelible feature of estoppel, as it has been traditionally defined, is that one party has made a representation, upon which another party justifiably relies to their detriment, such that it would be inequitable for the first party to take a subsequent position inconsistent with the truth of that representation. *See Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 400 (2d Cir. 2011) ("[E]quitable estoppel is properly invoked where the enforcement of the rights of one party

---

[9] Amazon did not expressly invoke the principle of equitable estoppel in its papers. It simply referred to *Motise I* and its progeny, without clearly explaining the theoretical underpinnings of this line of cases. (ECF No. 114, at 22; ECF No. 123, at 4; ECF No. 158, at 2; ECF No. 160, at 16-20). Nevertheless, "[i]t is … the substance of the claim, and not the language used in stating it, that controls." *Blitz v. Boog*, 328 F.2d 596, 599 (2d Cir. 1964). For the reasons stated herein, the Court finds that equitable estoppel is the appropriate doctrinal vehicle for Amazon's "derivative rights" theory.

would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct") (quoting *Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706, 725 (2d Cir. 2001)); 4 Williston on Contracts § 8:3 (4th ed.); 3 J. Pomeroy, Equity Jurisprudence §§ 804-805 (1941). Washington law is substantially in accord. *See Hartman v. Smith*, 100 Wash.2d 766, 769 (Wash. 1984) ("[W]here a person, by his acts or representations, causes another to change his position or to refrain from performing a necessary act to such person's detriment or prejudice, the person who performs such acts or makes such representations is precluded from asserting the conduct or forbearance of the other party to his own advantage"); *Nickell v. Southview Homeowners Ass'n*, 167 Wash. App. 42, 54 (Wash. App. 2012) (under Washington law, equitable estoppel requires "(1) an admission, statement, or act inconsistent with the claim afterwards asserted; (2) action by the other party on faith of such admission, statement, or act; and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act") (citing *Thomas v. Harlan*, 27 Wash.2d 512, 518 (Wash. 1947)). Traditional principles of equitable estoppel apply in the arbitration context just as they apply to other types of contractual disputes. *See Jacks v. CMH Homes, Inc.*, No. 15-CV-44 (VM), 2015 WL 5604005, at *4 (W.D. Okla. Sept. 23, 2015) (citing *Carter v. Schuster*, 227 P.3d 149, 154 (Okla. 2009)); *Haskins v. First American Title Ins. Co.*, 866 F.Supp.2d 343, 348-349 (D.N.J. 2012) (citing *Angrisani v. Financial Technology Ventures, L.P.*, 402 N.J. Super. 138, 153 (N.J. App. Div. 2008)); *Kingsley Capital Management, LLC v. Sly*, 820 F.Supp.2d 1011, 1023, 1024-25 (D. Ariz. 2011). A fruitful statement of the doctrine was given in the English case of *Cornish v. Abington*, 4 Hurl. & N. 549, 556 (Pollack, C.B.), *cited*, Pomeroy, *supra*, § 805, p. 194 n. 15:

> If any person, by a course of conduct or by actual expression, so conducts himself that another may reasonably infer the existence of an agreement or license, whether the party intends that he should do so or not, it has the

effect that the party using that language, or who has so conducted himself, cannot afterwards gainsay the reasonable inference to be drawn from his words or conduct.

Though expressed 160 years ago, Lord Chief Pollock's words describe precisely the inequity that occurs when one profits from the use of another's account on an e-commerce platform without adhering to the terms and conditions that govern the account. When one uses an account to transact online, an implicit representation is made that they are the person identified with the account, and thus are bound by the same terms and conditions previously agreed to by the account's true owner. Platforms such as Amazon fulfill orders and provide other services in reliance on that implied representation. In this case, Plaintiff's use of the Account was tantamount to a representation that he *was* Annemarie Nicosia (and therefore bound by the arbitration provision to which she had previously agreed). It equity and fairness, he should be bound by the consequences of that representation as though it were true.[10]

2.      Direct benefits estoppel

In the arbitration context, most courts have applied a modified test for equitable estoppel, known as the "direct benefits test," pursuant to which a nonsignatory may be compelled to arbitrate where it " 'knowingly accepts the benefits' of an agreement with an arbitration clause." *MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 61 (2d Cir. 2001) (quoting *Deloitte Noraudit A/S v. Deloitte Haskins & Sellis, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993)); *see also Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1046 (9th Cir. 2009) ("[A]

---

[10] Care must be taken to distinguish principles of equitable estoppel, upon which the Court relies here, with those of agency, which comprise no part of this analysis. Whether Plaintiff was an "agent" of Annemarie when he purchased 1 Day Diet is relevant only to the question of whether *Annemarie* could be bound by *Plaintiff's* actions. It is utterly irrelevant to the present question of whether *Plaintiff* is bound by *Annemarie*'s previous agreement to the contract. Indeed, even a stranger whose use of the Account were wholly unauthorized could be bound by the Account's terms and conditions—though he, not being an agent of the accountholder(s), would be unable to bind *them* to any new liabilities.

nonsignatory may be held to an arbitration clause 'where the nonsignatory "knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement" ' ") (quoting *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006)); *Payne v. Amazon.com, Inc.*, No. 17-CV-2313 (PMD), 2018 WL 4489275, at *6-*7 (D.S.C. Jul. 25, 2018) (applying Washington law); *Townsend v. Quadrant Corp.*, 173 Wash.2d 451, 461 (Wash. 2012); 21 Williston on Contracts § 57:19 (4th ed.); 1 Alt. Disp. Resol. § 8:8 (4th ed.). The direct benefits test "closely approaches the paradigm for [traditional] equitable estoppel," although it is not a "perfect overlap." *Kingsley*, 820 F.Supp.2d at 1024.

Consider the facts in *Bridge v. Credit One Financial*, 14-CV-1512 (LDG) (NJK), 2016 WL 1298712 (D. Nev. Mar. 31, 2016), a case which in all relevant respects resembles this one. The plaintiff's mother held an account at the defendant bank, Credit One. *See id.* at *1. In order to establish this account, she was acquired to sign a "cardholder agreement," which included an arbitration provision. *See id.* at *1-*2. She underwent surgery and was hospitalized, and the plaintiff, concerned about her finances in the event that she should pass away, called Credit One's toll-free automated information system in order to inquire about her account. *See id.* at *1. The automated system prompted the plaintiff to enter "your sixteen digit card number" and "the last four digits of your social security number," to which the plaintiff entered his mother's card number and social security number digits. *Id.* Upon successful authentication of the account and social security information, the plaintiff's was able to access the information he sought, but his phone number became linked to his mother's account. *See id.* After his mother's account became delinquent, calls were made to recover the debt, including to the plaintiff's phone number. *See id.* The plaintiff sued under the Telephone Consumer Protection Act, and the bank moved to compel arbitration. Although the plaintiff himself did not sign the arbitration agreement, the court held that he "benefitted from the agreement by calling Credit One, inputting his mother's

validation information, and gaining access to his mother's financial information." *Id.* at *3. The court found that plaintiff's claims were so related to the underlying cardholder agreement that he could be estopped from avoiding the arbitration provision. *See id.*[11]

Although the court in *Bridge* analyzed Credit One's motion to compel under the direct benefits test rather than traditional equitable estoppel, it is easy to see how the same result could have been reached under the latter theory. When the plaintiff provided his mother's personal information to Credit One's automated information system, he implicitly represented that he was the true accountholder. Credit One justifiably relied on that representation when it subsequently provided the information plaintiff sought.

This case is essentially no different from *Bridge*. When Plaintiff accessed the Annemarie Account and used it to place purchases of 1 Day Diet, he, like the plaintiff in *Bridge*, implicitly represented that he was the true accountholder. Like the plaintiff in *Bridge*, he directly benefited from the making of that representation, in that it allowed him to step into the shoes of his wife and enjoy the same contractual rights she enjoyed, *viz.*, the right to place an order on Amazon.com. Because plaintiff knowingly accepted the benefit of Annemarie's contractual relationship with Amazon, he must also be held to the arbitration clause that governs that relationship.

For these reasons, under either a traditional theory of equitable estoppel or direct benefits estoppel, Plaintiff is bound by the Amazon Mom Arbitration Agreement.

---

[11] The arbitration agreement in *Bridge* contained a clause stating that "Claims subject to arbitration include not only Claims made directly by you, but also Claims made by anyone connected with you or claiming through you, such as a co-applicant or authorized user of your account, your agent, representative or heirs, or a trustee in bankruptcy." *Id.* at *2. However, the court did not rely on this provision in reaching its decision. If it had, the court would have had no occasion to ground its ruling in equitable estoppel.

3.      Amazon's "derivative rights" argument is not waived

Plaintiff argues that the Court should deem Amazon's derivative rights argument waived because it was not specifically pleaded in Amazon's responsive pleadings. (ECF No. 121, at 20-21). *See* Fed. R. Civ. P. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: … arbitration and award; … [and] estoppel…."). The Court disagrees. In its Answer, Amazon asserted that "Plaintiff's purported claims … are subject to mandatory arbitration … pursuant to one or more agreements binding on the Plaintiff or applicable to the claims he purports to set forth." (ECF No. 84, at 34) (emphasis added). This broad phrasing put Plaintiff on notice that Amazon would seek not only to enforce the purported arbitration agreements that *he* entered into, but those that were "binding on [him]."

In any event, even where an affirmative defense is not adequately pleaded, a district court may still entertain it at the summary judgment stage "in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." *Estate of Hamilton v. City of New York*, 627 F.3d 50, 58 (2d Cir. 2010) (quoting *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003)), *superseded on other grounds*, *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102 (2d Cir. 2013); *accord Reives v. Lumpkin*, 632 Fed. Appx. 34, 35 (2d Cir. 2016) (summary order); *see also Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 105 (2d Cir. 2002) ("Absent a demonstration of prejudice by the defendant, the bare fact that [the defendants] filed an answer [without pleading arbitration] is inadequate by itself to support a claim of waiver of arbitration") (quoting *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 889 (2d Cir. 1985)). Amazon's failure to be more granular in its Answer about the specific arbitration agreements that it seeks to enforce could hardly be said to work unfair prejudice under the circumstances of this case. Plaintiff argues that "Amazon was in possession of his wife's Amazon account records since the beginning of this case" (ECF No.

121, at 20), but this argument cuts both ways. Plaintiff, too, was not ignorant of the fact that his 1 Day Diet purchases were made through a Prime account. (D. Nicosia Dep. at 136:12-138:12). Furthermore, discovery in this case focused not only on Plaintiff's Amazon usage, but that of his wife. It strains credulity to think that Plaintiff would have been surprised when Amazon asserted, in its motion to compel, that Plaintiff was bound by the arbitration agreement entered into by his wife.

## V.  Plaintiff's Remaining Contentions

1.  <u>Waiver</u>

Plaintiff argues that Amazon waived its right to arbitrate because it had previously moved to dismiss under Rule 12(b)(6). (ECF No. 121, at 5-8; ECF No. 159, at 6-11). The R&R is hereby adopted insofar as it rejected this argument. (R&R at 12-15).

The thrust of Plaintiff's objection is that Amazon should not be permitted to take a "heads-I-win-tails-you-lose" approach, where it is able to move to dismiss on the merits, winnow out certain claims in court, and only proceed to arbitration on the claims that were not dismissed. (ECF No. 159, at 3, 11). While this argument would have force if Amazon had only moved to dismiss on the merits, it must be rejected in this case, where Amazon moved to dismiss on *both* arbitrability *and* merits grounds. To find prejudice under these circumstances would be to endorse a rule that a defendant who has a colorable argument for dismissal on either merits or arbitrability grounds must choose one argument and abandon the other. Such a rule would work substantial prejudice—against the *defendant*.

The Court also rejects Plaintiff's argument (ECF No. 159, at 10-11) that the 32-month delay between Amazon's motion to dismiss and its motion to compel warrants a finding of waiver. (R&R at 13 ("[T]he 32-month period between commencement of the lawsuit and the instant motion, although significant, 'does not by itself support a finding of waiver' ") (quoting

*Chehebar v. Oak Fin. Grp., Inc.*, No. 14-CV-2982 (LDW), 2017 WL 946292, at *2 (E.D.N.Y.

Mar. 7, 2017)). Nor does the Court find compelling Plaintiff's argument that Amazon was able to

gain an unfair advantage by "see[ing] the strength of Plaintiff's case on the merits." (ECF No.

159, at 10). Finally, Plaintiff's argument that there has been litigation on "substantial issues

going to the merits" (ECF No. 159, at 8-9), is, as the R&R observed, "belied by the record"

(R&R at 14 n. 17). "[A]lthough the parties have engaged in discovery, it has been limited and

focused on the issue of whether Nicosia agreed to arbitrate." (*Id.* at 14) (internal quotation marks

and alterations omitted).

      Accordingly, the Court finds that Amazon's right to arbitration has not been waived.

2.     Actual and constructive notice

      The Court has reviewed Plaintiff's objections to those portions of the R&R which

concluded that Plaintiff had actual (*id.* at 19-22) and constructive (*id.* at 22-25) notice of the

COU through his use of the Amazon.com checkout page, and finds that they are academic in

light of the Court's disposition above, which is based on the Amazon Mom Arbitration

Agreement. Therefore, these objections are denied.

3.     Unilateral modification

      Plaintiff argues that he is not required to arbitrate this dispute because Amazon never

lawfully modified the pre-August 19, 2011 Conditions of Use, which did not contain an

arbitration clause. (ECF No. 159, at 11-14). However, as the Second Circuit clarified,

Washington law permits unilateral modifications to a contract "if there is notice and assent to the

changed terms." *Nicosia*, 834 F.3d at 235 (citing *Gaglidari v. Denny's Rests., Inc.*, 117 Wash.2d

426, 435 (Wash. 1991)). By enrolling in Amazon Mom, Annemarie (through her agent) was

notified of and assented to the arbitration clause. *See* Discussion III, *supra*. Therefore, insofar as

the Amazon Mom Arbitration Agreement constituted a "modification" of the existing contractual

relationship between Annemarie and Amazon, this modification was validly effected under Washington law.

4.    Illegality

Finally, the Court has reviewed Plaintiff's challenge to the validity of Amazon's agreement to sell 1 Day Diet on grounds of illegality (ECF No. 159, at 22-24), and finds that this objection is academic in light of the Court's disposition above, as Plaintiff does not challenge the legality or enforceability of the Amazon Mom Arbitration Agreement. In any event, the Court adopts the R&R insofar as it held that, if Plaintiff entered into an agreement to arbitrate by purchasing 1 Day Diet, the illegality of the contract would be a question for the arbitrator. (R&R at 30-32).

## VI.    Dismissal in Lieu of Stay

Amazon seeks, in addition to an order compelling arbitration, "an order … dismissing or staying these proceedings." (ECF No. 113). Although Section 3 of the FAA only speaks of staying proceedings, it is well-settled that an arbitrable dispute may be dismissed in lieu of a stay if the defendant requests dismissal. *See Zambrano v. Strategic Delivery Solutions, LLC*, No. 15-CV-8410 (ER), 2016 WL 5339552, at *10 (S.D.N.Y. Sept. 22, 2016). In this case, the Court will dismiss Plaintiff's claims.

## CONCLUSION

The conclusion that arbitration should prevail was arrived at within the legal framework set forth by the Court of Appeals, namely, whether a reasonably prudent internet user would have notice of Amazon's Conditions of Use. The conclusion is reached after substantial research and discussion of the cases and relevant literature summoned in the struggle created by the advent of the internet—the struggle to make the common law of contracts applicable when

people interacted with people in the commercial world, fit comfortably in a time when people interact with machines in that world and with each other.

However, the rule that the "existence" of additional contract terms must be made "reasonably conspicuous" is, this Court submits, largely a superfluity. The cases specify that such terms must be reasonably conspicuous from the point of view of a "reasonably prudent" user. *Meyer*, 868 F.3d at 77; *Berkson*, 97 F.Supp.3d at 401. But is there any question that reasonably prudent internet users know that there are terms and conditions attached when they log onto Facebook, order merchandise on Amazon, or hail a ride on Uber? They know this, not because a loud, brightly-colored notice on the screen tells them so, but because it would be difficult to exist in our technological society without some generalized awareness of the fact. *See Selden*, 2016 WL 6476934, at *5 ("The act of contracting for consumer services online is now commonplace in the American economy. Any reasonably-active adult consumer will almost certainly appreciate that by signing up for a particular service, he or she is accepting the terms and conditions of the provider"); Nancy S. Kim & D. A. Jeremy Telman, *Internet Giants as Quasi-Governmental Actors and the Limits of Contractual Consent*, 80 Mo. L. Rev. 723, 734 & n. 32 (2015) (observing that terms of service for online contracts are "widely mocked in popular culture").

It could be argued that the purpose of providing "reasonably conspicuous" notice of the hyperlinked terms is not merely to notify the user that these terms exist, but to encourage him or her to read them. But most consumers will not read the terms and conditions, no matter how prominently the notice is displayed, and those that do will usually not understand them. *See* Jeff Sovern, Elayne E. Greenberg, Paul F. Kirgis and Yuxiang Liu, *"Whimsy Little Contracts" With Unexpected Consequences: An Empirical Analysis of Consumer Understanding of Arbitration Agreements*, 75 Md. L. Rev. 1, 47 (2015); Yannis Bakos, Florencia Marotta-Wurgler and David

R. Trossen, *Does Anyone Read the Fine Print? Consumer Attention to Standard-Form Contracts*, 43 J. Legal Stud. 1, 32 (2014). Among those that both read and understand the terms of use, most will proceed with the transaction anyway, because the terms are presented on a take-it-or-leave-it basis. The "reasonably conspicuous" notice rule is therefore one which is unlikely to have much effect, if any, on overall consumer welfare. *See* Erin Canino, Note, *The Electronic "Sign-In-Wrap" Contract: Issues of Notice and Assent, the Average Internet User Standard, and Unconscionability,* 50 U.C. Davis L. Rev. 535, 566 (2016) ("[M]ost consumers do not ever read these online contracts, so regardless of increased notice, users are still not informed. Recognizing this reality then suggests that this heightened notice is merely formulaic, but not necessarily a solution for putting a user on notice"); Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459, 469-470 (2006) ("Since no one reads [clickwrap or shrinkwrap] anyway, and owners can include whatever terms they want, it seems a sort of formalism to require them to go through the effort of requiring some weak manifestation of assent"); Robert A. Hillman, *Online Boilerplate: Would Mandatory Website Disclosure of E-Standard Terms Backfire?*, 104 Mich. L. Rev. 837, 850 (2006) ("Mandatory website disclosure may not increase reading and [term-]shopping because most of the rational, cognitive, and emotional reasons consumers do not read terms still apply regardless of when businesses display the terms").

The puzzle, then, is this. On the one hand, the law cannot countenance an environment where unscrupulous merchants are able to insert any contractual term they wish into the hybridwrap agreement and expect automatic enforcement. On the other hand, a legal rule which merely exalts the *form* and *visual layout* of the hybridwrap agreement, incentivizing merchants to adopt some judicially-favored website designs while foregoing others, is unlikely to have more than a negligible impact on the way buyers and sellers contract over the internet.

This Court suggests that Llewellyn had the answer: rather than scrutinizing hybridwrap agreements for contract formation issues, courts should recognize that such agreements, like other adhesive contracts, represent in substance a "blanket assent" to any terms that are not objectively unreasonable. Llewellyn, *Common Law Tradition*, *supra*, at 370; *see also* Restatement (Second) of Contracts § 211 cmt. f. Accepting this framework, such terms should be rigorously scrutinized for substantive unreasonableness, perhaps to a greater degree than they have been subjected thus far. *See* Robert L. Oakley, *Fairness in Electronic Contracting: Minimum Standards for Non-Negotiated Contracts*, 42 Hous. L. Rev. 1041, 1064 (2005) (finding that "the number of cases in which [unconscionability] has actually been found is relatively small"). True, where an arbitration agreement is concerned, a court's latitude to declare certain provisions unconscionable, such as class arbitration waivers, is heavily circumscribed by the FAA, as interpreted by the nation's highest Court. *See Concepcion*, *supra*. But as a general principle, a judicial approach which shifts the inquiry away from the formal trappings of the contract, *e.g.,* notice and acceptance, to the substance of its terms, will much more readily honor the merchant's legitimate commercial expectations while safeguarding the consumer from abuse.

Exquisitely applicable and responsive to the stubborn problems presented by this case and countless others like it is the observation by Oliver Wendell Holmes, Jr. in his 1881 Lectures on the Common Law: "The life of the law has not been logic: it has been experience. The felt necessities of the time … have had a good deal more to do than the syllogism in determining the rules by which men should be governed." Oliver Wendell Holmes, Jr., *The Common Law* 1 (1881). Experience, not logic, has taught that a purchase on the internet is determined by rules different from a purchase of milk at the corner grocery, a thought expressed more simply and vividly by Judge Cardozo in *MacPherson v. Buick Motor Co.*: "Precedents drawn from the days

of travel by stage coach do not fit the conditions of travel today." 217 N.Y. 382, 391 (N.Y. 1916).

For the reasons set forth in the previous sections and the R&R as adopted, Amazon's motion to compel arbitration is **GRANTED**, and Amazon's motion to dismiss Plaintiff's claims is **GRANTED.**

SO ORDERED.

Dated:     Brooklyn, New York
            June 14, 2019

/s _____

I. Leo Glasser               U.S.D.J.

# APPENDIX A

## Amazon Mom Sign-Up Flow (Ressmeyer Ex. J, at AMZ000371-000372).

**amazon**

Free Click to Amazon.com | Today's Deals | Gift Cards | Help

The All-New Kindle Family: from $79

Shop by Department ▾ | Search All ▾ | Go

Hello, Your Account ▾ | Cart ▾ | Wish List ▾

### Step 1 of 2

**Sign up for Amazon Mom**

The more we know about you and your family, the more we can personalize offers, e-mails, and product recommendations to help you find exactly what you need at just the right time. On the next page, we will collect your credit card information to complete your registration.

**I am a:** Mom ▾

**Are you expecting?** ● No ○ Yes

**Are you planning to adopt?** ● No ○ Yes

Enter each child's first name or nickname, birthday, and gender. You can always update this information later in Your Account:

**Name:** [_____] | Month ▾ | Day ▾ | Year ▾ | ● Girl ○ Boy

[Add a child]

When it comes to shopping online, everyone likes to save time and money - but if you had to choose one, what would it be?
○ Saving time ○ Saving money

**Which of these products interest you most (pick at least one):**

☐ Disposable diapers | ☐ Baby & kids apparel | ☐ Kitchen & home goods
☐ Cloth diapers | ☐ Gear (including strollers, car seats, etc.) | ☐ Pet supplies
☐ Wipes | ☐ Cameras | ☐ Books
☐ Formula | ☐ Smartphones | ☐ None
☐ Baby food | ☐ Electronics

**Which of these product styles or qualities do you value the most (pick at least one):**

☐ Green/Environmentally-friendly | ☐ Unique
☐ Modern | ☐ Trend-Setting
☐ Classic | ☐ Best-Value
☐ Best-Selling | ☐ None

**Do you own a smartphone?** ● No ○ Yes

By clicking the **Continue** button, you acknowledge that you agree to the Amazon Mom Terms and Conditions.

[Continue] [Cancel]

**Get to Know Us**
Careers
Investor Relations
Press Releases
Amazon and Our Planet
Amazon in the Community

**Make Money with Us**
Sell on Amazon
Become an Affiliate
Advertise Your Products
Independently Publish with Us
› See all

**Let Us Help You**
Your Account
Shipping Rates & Policies
Amazon Prime
Returns Are Easy
Manage Your Kindle
Help

**amazon.com**

Canada  China  France  Germany  Italy  Japan  Spain  United Kingdom

| | | | | | |
|---|---|---|---|---|---|
| AbeBooks Rare Books & Textbooks | AmazonLocal Great Local Deals in Your City | AmazonSupply Business, Industrial & Scientific Supplies | AmazonWebServices Scalable Cloud Services | AmazonWireless Cellphones & Wireless Plans | Askville Community Answers |
| Audible Download Audio Books | BeautyBar.com Prestige Beauty Delivered | | | | |
| Book Depository Books With Free Delivery Worldwide | CreateSpace Indie Publishing Made Easy | Diapers.com Everything But The Baby | DPReview Digital Photography | Fabric Sewing, Quilting & Knitting | IMDb Movies, TV & Celebrities |
| Junglee.com Shop Online in India | MYHABIT Private Fashion Designer Sales | | | | |
| Shopbop Designer Fashion Brands | Soap.com Health, Beauty & Home Essentials | Wag.com Everything For Your Pet | Warehouse Deals Open-Box Discounts | Woot! Never Gonna Give You Up | Yoyo.com A-Happy Place To Shop For Toys |
| Zappos Shoes & Clothing | | | | | |

Conditions of Use  Privacy Notice  Interest-Based Ads  © 1996-2012, Amazon.com, Inc. or its affiliates

AMZ000371

40

